T.C. Memo. 2004-57

UNITED STATES TAX COURT

PAMELA J. ELLISON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11718-02.          Filed March 9, 2004.

<u>Terri A. Merriam</u>, <u>Wendy S. Pearson</u>, and <u>Jennifer A. Gellner</u>,
for petitioner.

<u>Margaret A. Martin</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined that petitioner did
not qualify for relief from joint and several liability pursuant
to section 6015(b), (c), or (f).[1]  The issue for decision is

---

[1]  Unless otherwise indicated, all section references are to
the Internal Revenue Code, and all Rule references are to the Tax
(continued...)

whether petitioner is entitled to relief from joint and several liability pursuant to section 6015(b) or (f) for 1982, 1983, 1984, 1985, and 1986.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first stipulation of facts, second stipulation of facts, third stipulation of facts, and the attached exhibits are incorporated herein by this reference. At the time she filed the petition, petitioner resided in Monroe, Michigan.

Petitioner and Her Husband

Petitioner has a high school education that, since 1991, she has supplemented with some college courses in bank management.

Petitioner married Don Ellison (Mr. Ellison) in 1971. As of the date of trial, petitioner and Mr. Ellison were married and living together. Mr. Ellison is currently employed as an inspector at the Ford Motor Co.

From 1971 to 1988, petitioner mainly worked part-time jobs. In 1986, however, she worked full time as a bank teller. Since 1990, petitioner has worked full time as a collections supervisor at a financial institution.

[1](...continued)
Court Rules of Practice and Procedure.

[2] In her petition, petitioner sought relief pursuant to sec. 6015(b) and (f). Accordingly, sec. 6015(c) is not in issue.

As of the time of trial, petitioner was 48 years old and in good health.

## Petitioner's Relationship With Mr. Ellison

Mr. Ellison did not conceal anything from petitioner. Mr. Ellison did not deceive petitioner. Mr. Ellison did not hide, or try to hide, any information or documents from petitioner.

Mr. Ellison never threatened or coerced petitioner into making investments, signing their tax returns, or signing checks. Mr. Ellison did not abuse petitioner.

## Hoyt Partnerships

Walter J. Hoyt III and some members of his family were in the business of creating tax shelter limited partnerships for their cattle breeding operations (Hoyt partnerships). As part of their services, the Hoyt organization also prepared the investor's tax returns. For a description of the Hoyt organization and its operation, see Bales v. Commissioner, T.C. Memo. 1989-568; see also River City Ranches #1 Ltd. v. Commissioner, T.C. Memo. 2003-150; Mekulsia v. Commissioner, T.C. Memo. 2003-138; River City Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209, affd. 23 Fed. Appx. 744 (9th Cir. 2001).

## Investment in DGE 1984-2

Around 1985, Mr. Ellison was working in construction. He heard about the Hoyt partnerships from his co-workers. In the fall of 1985, he told petitioner about the Hoyt partnerships.

Mr. Ellison talked with petitioner about the Hoyt partnerships and showed her Hoyt partnerships promotional materials. Petitioner attended a Hoyt investor meeting.

Petitioner was not interested in investing in the Hoyt partnerships. Petitioner was skeptical regarding how an investment in the Hoyt partnerships would reduce her tax liability and would generate large tax refunds. Petitioner did not think it would work.

Mr. Ellison sought advice from an attorney about the Hoyt partnerships. The attorney told Mr. Ellison that it was a risky investment, but that if the Hoyt organization did what it said it would do that it was legal.

Mr. Ellison told petitioner that he investigated the Hoyt partnerships. Petitioner did not know, or ask Mr. Ellison, who he had talked to or how he had obtained his information (i.e., whether it was from an attorney, a tax professional, someone outside or inside the Hoyt organization, a co-worker of Mr. Ellison, etc.). Petitioner never suggested seeking the advice of someone outside the Hoyt organization regarding the Hoyt partnerships.

Mr. Ellison persuaded petitioner to invest in the Hoyt partnerships. There was no hostility or threats. Mr. Ellison did not force petitioner to invest in the Hoyt partnerships. Petitioner signed the Hoyt partnerships investment documents. In

1985, petitioner and Mr. Ellison invested in Durham Genetic Engineering 1984-2 (DGE 1984-2), one of the Hoyt partnerships.[3]

In 1985, petitioner and Mr. Ellison paid no "cash" to DGE 1984-2. In 1986, petitioner and Mr. Ellison paid $20,750 in "cash" to DGE 1984-2.

Petitioner signed checks, on accounts held jointly by petitioner and Mr. Ellison, made payable to Hoyt partnerships or the Hoyt organization. Several of these checks were for thousands of dollars.

Petitioner did not ask Mr. Ellison detailed questions about the Hoyt partnerships--especially before they were contacted by the Internal Revenue Service (IRS) about this investment and the deductions associated with it. Mr. Ellison's responses to petitioner's questions usually were along the lines of: "Hoyt has it under control", "Hoyt is dealing with it", or "Don't worry about it".

Apart from the Hoyt partnerships, petitioner and Mr. Ellison did not have any investments at the time they invested in the Hoyt partnerships.

Documents From the Hoyt Organization

Promotional materials and correspondence, including bills, from the Hoyt organization were mailed (i.e., addressed) to

_____

[3] Petitioner and Mr. Ellison invested in several other Hoyt partnerships subsequent to the years in issue.

petitioner and Mr. Ellison.  Letters and other documents provided to petitioner and Mr. Ellison by the Hoyt organization referred to petitioner and Mr. Ellison as partners and listed "Don & Pam Ellison" under the heading of partner's name.

Petitioner and Mr. Ellison received promotional materials from the Hoyt organization about the Hoyt partnerships.  Mr. Ellison kept these materials in his files.  One of the promotional materials included the following language under the heading Specific Risks Involved:  "A change in the tax laws or an audit and disallowance by the IRS could take away all or part of the tax benefits, plus the possibility of having to pay the tax along with penalties and interest".  It further stated:

> This term ["head torn off"] is crude but, it is a concept that is very applicable to the comparison of having a disallowance of your partnership tax deductions by the Internal Revenue Service.  The prospect of having to pay the taxes when you have put your tax money into a tax shelter, and it's gone, is a financial wreck.

The brochure went on to state that there was no assurance that things would be "O.K."  In discussing the preparation of investor tax returns, the promotional materials warned "there is a risk" and stated that after many years of experience with tax shelters the Hoyt partnerships have learned how "to deal with IRS audits of the Partnerships' returns and the Partners' personal returns, (being 'attacked' by the IRS)".  The promotional materials also

advised prospective investors to get "expert tax help" concerning the Hoyt partnerships.

The promotional materials further stated: "If a Partner needs more or less Partnership loss to be special[ly] allocated to him for any year, it is arranged quickly within the same office, without the Partner having to pay a higher fee while an outside preparer spends more time to make the arrangements."

The promotional materials clearly contemplated the tax shelter being audited by the IRS--stating at one point: "we know we will be subject to constant audits by the IRS".

Other documents petitioner and Mr. Ellison received from the Hoyt organization contained the following statements under the heading "Federal Income Tax Related Risks":

> Special tax counsel to the Partnership has not provided any opinion with respect to IRS recognizing the Partnership as a Partnership for tax purposes, the deductibility or treatment of any particular item, the proper percentages for allocating Partnership profits, losses, gains, deductions or credits among Partners, the fair market value of the purchased Registered Shorthorn Cattle or the amount of allowable income, credit, or losses that may be generated by the Partnership.

> NO ASSURANCE CAN BE GIVEN THAT THE IRS WILL NOT ATTEMPT TO TREAT THE PARTNERSHIP AS A TAX SHELTER, or whether such attempt to treat the Partnership as a tax shelter would not be successful.

> Moreover, because the Partnership has not requested a ruling from the IRS with respect to any of the tax consequences of the Partnership, there is an inherent and substantial risk that such benefits might be challenged in whole or in part by the IRS.

Because a special Tax Counsel's opinion concerning the tax status of the Partnership is not binding on the IRS or any court, one was not requested or obtained because no assurance can be given that the IRS might not successfully challenge the tax classification of the Partnership.

IRS audits of the Partnership's tax returns are certain.

As of the date of this Memorandum, the IRS has proposed disallowance of certain losses and investment tax credits assigned to the Limited Partners of seventeen (17) prior Partnerships for the tax years 1977, 1978, 1979, and 1980.

No assurance can be given the IRS will not challenge [the allocations made by the Hoyt organization].

There can be no assurance that the tax consequences indicated herein will be applied to the Partnership or to the Partners since such matters are subject to change by legislation, administrative action and judicial decision.

Tax Returns

Petitioner and Mr. Ellison filed joint Federal income tax returns for 1982, 1983, 1984, 1985, and 1986. Before petitioner and Mr. Ellison invested in the Hoyt partnerships, H & R Block prepared their returns. After petitioner and Mr. Ellison invested in the Hoyt partnerships, the Hoyt organization prepared their returns.

On their joint income tax return for 1985, petitioner and Mr. Ellison reported $77,649 in wages. In arriving at total income, the only additions and subtractions were $1,167 in interest income, $442 in taxable refunds of State and local taxes, and a $128,407 Schedule E, Supplemental Income Schedule,

loss. This Schedule E loss was entirely attributable to petitioner and Mr. Ellison's investment in the Hoyt partnerships. The total tax listed was zero. The Federal income tax withheld listed was $16,872. The Tax Office of W.J. Hoyt Sons Management Co. was listed as the return preparer on the 1985 return.

Mr. Ellison reviewed his joint return for 1985. He noted that the deduction related to the Hoyt partnerships was large compared with his income. Petitioner did not review her joint returns for 1985 or 1986.

On their joint income tax return for 1986, petitioner and Mr. Ellison reported $33,274 in wages. In arriving at total income, the only additions and subtractions were $1,689 in interest income, $74 in taxable refunds of State and local taxes, a $20 other loss (related to the sale or exchange of a trailer), $2,973 in taxable unemployment compensation, and a $14,598 Schedule E loss. Most of the Schedule E loss was attributable to petitioner and Mr. Ellison's investment in the Hoyt partnerships. The total tax listed was zero. The Federal income tax withheld listed was $7,932. The Tax Office of W.J. Hoyt Sons Management Co. was listed as the return preparer on the 1986 return.

The Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., issued by the Hoyt partnerships to petitioner

and Mr. Ellison for 1985 and 1986 list the following under the area for partner's name:  "Don & Pamela Ellison".[4]

In 1986, petitioner and Mr. Ellison applied for a refund of their 1982, 1983, and 1984 taxes in the amounts of $1,629, $833, and $2,097, respectively.

On June 16, 1998, respondent mailed petitioner and Mr. Ellison two letters and reports explaining computational adjustments made to their 1982, 1983, 1984, 1985, and 1986 returns as a result of adjustments made to the partnership returns of DGE 1984-2 for 1985 and 1986.  These computational adjustments resulted from the Court's opinion in <u>Shorthorn Genetic Engg. 1982-2, Ltd. v. Commissioner</u>, T.C. Memo. 1996-515.

<u>Request for Relief From Joint and Several Liability</u>

On or about July 17, 2000, petitioner mailed respondent a Form 8857, Request for Innocent Spouse Relief (and Separation of Liability and Equitable Relief).[5]  Betty Sneed and Bonnie Halbert were assigned to review petitioner's request for section 6015 relief.

---

[4]  This is also true for the years subsequent to the years in issue (1987 through 1995).

[5]  Petitioner requested relief for the tax years 1982 through 1997.  On Nov. 14, 2000, respondent mailed petitioner a letter advising her that the request was premature for the years 1987 through 1997 as the request related to a potential assessment from a TEFRA (Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324) partnership proceeding that, as of that date, had not been concluded.

In processing petitioner's claim, the agent assigned to petitioner's case requested Hoyt partnerships related information regarding petitioner and Mr. Ellison from Revenue Agent Deborah Ritchie.[6] Ms. Ritchie provided the employees reviewing petitioner's claim with a computer printout for Hoyt partnerships taxable years related to petitioner and Mr. Ellison, copies of Schedules K-1 issued to petitioner and Mr. Ellison from the Hoyt partnerships, copies of checks signed by petitioner or Mr. Ellison made payable to Hoyt partnerships, and Hoyt partnerships documents signed by petitioner and Mr. Ellison.

On November 6, 2000, respondent mailed Mr. Ellison a letter notifying him of petitioner's request for relief from joint and several liability.

On August 9, 2001, Ms. Halbert prepared a written evaluation of petitioner's claim. Ms. Halbert concluded that petitioner was not entitled to section 6015(b) relief because petitioner knew of the Hoyt partnerships and owned the item that gave rise to the deficiency (i.e., the Hoyt partnerships). Ms. Halbert concluded that no factor favored granting section 6015(f) relief and the following factors weighed against granting section 6015(f) relief: (1) Lack of economic hardship, (2) the liability was not

_____

[6] Ms. Ritchie worked on the "Hoyt audit team" and the "Hoyt tax shelter project". The Hoyt tax shelter project examined Hoyt partnerships. Ms. Ritchie assisted District Counsel in preparing Hoyt partnerships cases for trial.

solely attributable to the nonrequesting spouse, and (3) the requesting spouse had knowledge or reason to know.  Accordingly, Ms. Halbert concluded it was not inequitable to hold petitioner liable.

On August 21, 2001, respondent mailed petitioner a preliminary determination with respect to petitioner's request for relief from joint and several liability for 1982 through 1986.  Respondent determined that petitioner was not entitled to relief pursuant to section 6015(b), (c), or (f).

On September 14, 2001, petitioner mailed respondent, among other things, a statement of disagreement with respondent's preliminary determination.

Appeals Officer Bonnie Boak was assigned to review petitioner's case.  Ms. Boak had no prior involvement with Hoyt partnerships cases.

On January 9, 2002, Ms. Boak mailed petitioner's counsel a letter that proposed arranging an Appeals conference.  That same date, Ms. Boak mailed Mr. Ellison's counsel (who also is petitioner's counsel) a letter to notify Mr. Ellison of petitioner's request for relief from joint and several liability and offering Mr. Ellison the opportunity to submit any additional information or to meet with Ms. Boak regarding petitioner's claim.

On February 14, 2002, petitioner's counsel mailed a letter to Ms. Boak that supplemented the facts and legal arguments for her consideration.

Ms. Boak provided petitioner with the opportunity to submit any additional information for Ms. Boak to consider before completing her review of petitioner's case. Ms. Boak reviewed and considered everything submitted to her by petitioner and her attorneys. Ms. Boak spent approximately 10 to 20 hours on the phone with petitioner's attorneys discussing petitioner's case.

On April 2, 2002, Ms. Boak wrote petitioner's counsel a 5-page letter advising her (petitioner's counsel) that she agreed with the service center's decision to deny section 6015 relief and provided a detailed explanation supporting her conclusions and responding to petitioner's counsel's legal arguments.

On or about April 8, 2002, after completing her review of petitioner's case (which included all materials contained in respondent's file and provided by petitioner and her counsel), Ms. Boak prepared an Appeals Case Memorandum. Ms. Boak concluded that petitioner was not entitled to relief from liability pursuant to section 6015(b), (c), or (f) for 1982 through 1986. Team Manager Leonard Bartold approved Ms. Boak's Appeals Case Memorandum.

On April 17, 2002, respondent mailed petitioner a notice of determination that determined petitioner was not entitled to

relief from liability pursuant to section 6015(b), (c), or (f) for 1982 through 1986 (notice of determination). The notice of determination listed the following amounts of tax[7] outstanding: $5,454 for 1982, $2,593 for 1983, $7,207 for 1984, $56,081 for 1985, and $1,745 for 1986.

Petitioner's Financial Status

On February 28, 2003, petitioner and Mr. Ellison signed a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals. The Form 433-A contained the following statements: Petitioner and Mr. Ellison owned the home that they purchased in June 1989 for $97,000, with a current value of $150,000, a loan balance of $123,463, and a monthly payment totaling $1,015; they had no dependents they could claim on their tax return; they had two checking accounts and one savings account at Monroe Bank & Trust with a total balance of $4,398. Their investments (Form 433-A investments) included: (1) Monroe Bank & Trust (401k) with a current value of $30,362; (2) Fidelity-IISI, Inc. (401k) with a current value of $17,329; (3) Fidelity-Ford Tesphe (401k) with a current value of $44,917; (4) Fidelity Investments (IRA-Pam) with a current value of $2,526; and (5) 266 shares of Monroe Bank & Trust with a current value of $2,979. They had available credit of $15,420 from Key Bank and they had life insurance with a current cash value of

---

[7] These amounts included interest.

$3,554 (after subtracting for outstanding loans). They also owned two cars (a 2001 Ford Windstar and a 1990 Honda Civic) worth a total of $12,790 (with no outstanding loans on the vehicles); a 1998 Sea-Doo GTi 3-Pass, a 1997 Sea-Doo GTi 3 3-Pass, and a Kawasaki VN 1500-D2 Vulcan Clsc worth a total of $9,160 (with no outstanding loans on the vehicles); they were leasing a 2002 Ford Ranger; and they had no personal assets (i.e., zero).

In determining the current value of their Form 433-A investments, petitioner and Mr. Ellison valued them at 60 percent of the face value even though the Form 433-A states: "Current Value: Indicate the amount you could sell the asset for today." In determining the current value of their real estate, petitioner and Mr. Ellison valued their home at "80 percent quick sale value" even though the Form 433-A states: "Current Value: Indicate the amount you could sell the asset for today."

Under the monthly income and expense analysis on Form 433-A, petitioner and Mr. Ellison listed monthly wages of $4,688 for Mr. Ellison, monthly wages of $1,977 for petitioner, and monthly interest/dividends of $33 for total monthly income of $6,698. Under total living expenses, petitioner and Mr. Ellison listed $1,290 for food, clothing, and miscellaneous; $1,583 for housing and utilities; $617 for transportation; $1,452 for taxes; $210

for other secured debt (lease payments);[8] and $412 for other expenses consisting of attorney's fees.  This brought their total expenses to $5,564[9] per month.

Attached to the Form 433-A were the following:  A uniform residential appraisal report for petitioner and Mr. Ellison's home with an estimate of fair market value, as of June 29, 1999, of $150,000; Monroe Bank & Trust statements for petitioner and Mr. Ellison (1) dated January 17, 2003, which listed their average balance of $776.30, a beginning balance of $1,060, and an ending balance of $404.42 in their "regular personal account", (2) dated January 23, 2003, which listed a beginning balance of $5,728.73 and an ending balance of $4,890.64 in their "Personal M.M.P." account, and (3) dated January 23, 2003, listing a balance of $137.50 in their "savings" account; a Monroe Bank & Trust Employee Savings Trust statement with a current and vested balance as of February 13, 2003, totaling $54,924.97; a Fidelity account statement listing a closing and vested balance as of February 14, 2003, totaling $28,880.89; a Fidelity account statement listing a closing and vested balance as of January 23, 2003, totaling $102,892.44 ($73,355.46 in Ford Tesphe and $29,536.98 in IISI, Inc.); a Form 5498, IRA Contribution

---

[8]  The Form 433-A, however, states that transportation expense includes lease payments.

[9]  On the Form 433-A, petitioner and Mr. Ellison listed this total as $5,659.

Information, for 2002 from Fidelity Investments issued to petitioner with a fair market value of $4,183.39 as of December 31, 2002; and their 2001 joint tax return which listed adjusted gross income of $92,840.

OPINION

I.   Evidentiary Issue

As a preliminary matter, we must decide whether a document petitioner submitted during the trial of this case should be admitted into evidence.  At trial, petitioner sought to introduce a "fraud referral" memorandum for Walter J. Hoyt III (Exhibit 86-P).  Respondent objected to the admission of Exhibit 86-P on the grounds of authentication, relevance, and hearsay.  We reserved ruling on Exhibit 86-P's admissibility.

Petitioner failed to make any arguments regarding the admissibility of Exhibit 86-P in her opening brief.  In her reply brief, petitioner stated:  "Petitioner has addressed the relevance and purpose of Exhibit 86-P in her opening brief, in the context of proposed findings of fact."

For the reasons stated in Doyel v. Commissioner, T.C. Memo. 2004-35 (abandonment, hearsay, lack of authenticity, relevancy, and wastefulness), we do not admit Exhibit 86-P into evidence.

II.  Section 6015 Relief

In general, spouses filing joint Federal income tax returns are jointly and severally liable for all taxes due.  Sec.

6013(d)(3). Under certain circumstances, however, section 6015 provides relief from this general rule. Except as otherwise provided in section 6015, petitioner bears the burden of proof. Rule 142(a); <u>Jonson v. Commissioner</u>, 118 T.C. 106, 113 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

In arguing that petitioner is entitled to relief pursuant to section 6015, petitioner relies upon the regulations related to section 6015. Sections 1.6015-0 through 1.6015-9, Income Tax Regs., are applicable for elections or requests for relief filed on or after July 18, 2002. Sec. 1.6015-9, Income Tax Regs. Petitioner filed her election prior to this date; accordingly, the regulations are inapplicable.

Petitioner also cites chief counsel advice and Tax Court summary opinions to support her claims. Parties are statutorily proscribed from citing chief counsel advice as precedent. Sec. 6110(k)(3); see <u>Willamette Indus., Inc. v. Commissioner</u>, 118 T.C. 126, 134 n.10 (2002). By statute, summary opinions shall not be treated as precedent. Sec. 7463(b).

A. <u>Relief Under Section 6015(b)</u>

To qualify for relief from joint and several liability under section 6015(b)(1), a taxpayer must establish:

> (A) a joint return has been made for a taxable year;
>
> (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;

(C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election * * *.

The requirements of section 6015(b)(1) are stated in the conjunctive. Accordingly, a failure to meet any one of them is sufficient for us to find that petitioner does not qualify for relief pursuant to section 6015(b). Alt v. Commissioner, 119 T.C. 306, 313 (2002).

Respondent contends that petitioner failed to establish the requirements of subparagraphs (B), (C), and (D). We need not decide whether petitioner satisfies the requirements of subparagraphs (C) and (D) because we find that the understatements of tax on the returns in issue are not attributable to the erroneous items of 1 individual filing the joint return.

Petitioner admits that the Hoyt partnerships caused the erroneous items on the returns. Petitioner, however, contends that the Hoyt partnerships are not attributable to her.

Petitioner was a partner in the Hoyt partnerships. She signed documents relating to her and Mr. Ellison's investment in the Hoyt partnerships. See Hayman v. Commissioner, 992 F.2d 1256, 1260-1261 (2d Cir. 1993), affg. T.C. Memo. 1992-228. Although petitioner may have signed the checks to the Hoyt organization because Mr. Ellison asked her, the checks made payable to Hoyt partnerships were drawn on petitioner and Mr. Ellison's joint bank account.

Furthermore, it is clear that the Hoyt organization treated her, and Mr. Ellison, as a partner in the Hoyt partnerships. The Schedules K-1 the Hoyt organization issued regarding their investment in DGE 1984-2 listed petitioner and Mr. Ellison as partners in this Hoyt partnership. Additionally, numerous other documents refer to her as a partner in the Hoyt partnerships.

Finally, Mr. Ellison may have taken the initiative and played a more dominant role in deciding to invest in the Hoyt partnerships, but petitioner agreed to invest in the Hoyt partnerships, and she did it jointly with Mr. Ellison. Petitioner considered the Hoyt partnerships to be her and Mr. Ellison's investment. Additionally, petitioner admitted, in her petition, to being a partner in DGE 1984-2 in 1985 and 1996.

Accordingly, we conclude that the understatements are not attributable to the erroneous items of one individual filing the joint returns. See Doyel v. Commissioner, T.C. Memo. 2004-35

(investment in Hoyt partnership was attributable to the taxpayer requesting section 6015 relief because she was a partner in the Hoyt partnership).  Accordingly, we conclude that petitioner is not entitled to relief pursuant to section 6015(b).

B.   Relief Under Section 6015(f)

Respondent argues that he did not abuse his discretion in denying petitioner equitable relief under section 6015(f). Respondent's denial of relief is reviewed under an abuse of discretion standard.  Cheshire v. Commissioner, 115 T.C. 183, 198 (2000), affd. 282 F.3d 326 (5th Cir. 2002); Butler v. Commissioner, 114 T.C. 276, 292 (2000).  Our review is not limited to respondent's administrative record.  Ewing v. Commissioner, 122 T.C. ___ (2004).

As directed by section 6015(f), the Commissioner prescribed procedures in Rev. Proc. 2000-15, 2000-1 C.B. 447,[10] that respondent uses to determine whether an individual qualifies for relief under section 6015(f).

In this case, none of the six factors in Rev. Proc. 2000-15, 2000-1 C.B. 447, weighing in favor of granting relief are

---

[10]  We note that Rev. Proc. 2003-61, 2003-32 I.R.B. 296 (Aug. 11, 2003), superseded Rev. Proc. 2000-15, 2000-1 C.B. 447. Rev. Proc. 2003-61, sec. 6, 2003-32 I.R.B. at 299.  The new revenue procedure, however, is effective for requests for relief filed on or after Nov. 1, 2003.  Id.  Accordingly, it is inapplicable to the case at bar.

present:[11] (1) Petitioner was not separated or divorced from Mr. Ellison, (2) petitioner will not suffer economic hardship if relief is denied, (3) petitioner was not abused by Mr. Ellison, (4) petitioner knew or had reason to know of the item giving rise to the deficiency, (5) Mr. Ellison did not have an obligation to pay the liability pursuant to a divorce decree, and (6) the items giving rise to the deficiencies are not attributable solely to Mr. Ellison. See Washington v. Commissioner, 120 T.C. 137, 147 (2003). Additionally, the following factors weighing against relief are present:[12] (1) The items giving rise to the deficiencies are attributable to petitioner, (2) petitioner knew

---

[11] We note that in her Appeals memorandum, Ms. Boak considered the fact that petitioner and Mr. Ellison were still married and living together, there was no abuse, and that there was no legal obligation of the nonrequesting spouse to pay the liability to be factors weighing against sec. 6015(f) relief. This was incorrect--she should have treated them as neutral. Washington v. Commissioner, 120 T.C. 137, 149 (2003). Ms. Halbert, who initially reviewed the case, however, did not consider the absence of these factors to weigh against granting equitable relief.

It is unclear whether the notice of determination is based on Ms. Halbert's or Ms. Boak's analysis. Regardless, neither found any factors weighing in favor of relief to be present and both found factors that properly weighed against relief to be present. Accordingly, Ms. Boak's mistake is not a basis for finding that respondent abused his discretion.

[12] The absence of certain factors weighing against equitable relief does not weigh in favor of granting relief--they are neutral. Doyel v. Commissioner, T.C. Memo. 2004-35; see Washington v. Commissioner, supra at 149.

or had reason to know of the item giving rise to the deficiency, and (3) petitioner will not suffer economic hardship.  Id.

Petitioner claims:  She did not want to stay in the Hoyt partnerships, but Mr. Ellison did; Mr. Ellison played the dominant role in handling the financial affairs of their family; and she did not have a choice not to sign the Hoyt documents or her tax returns and that she had to do what Mr. Ellison wanted.

Petitioner left the final decision to invest in the Hoyt partnerships to Mr. Ellison--essentially, petitioner acquiesced or agreed to go along with Mr. Ellison's wishes.  Additionally, petitioner and Mr. Ellison testified that Mr. Ellison did not threaten or abuse petitioner and that he did not force petitioner to invest in the Hoyt partnerships.

Petitioner also notes that Mr. Ellison opened all the mail from the Hoyt organization and the IRS.

Mr. Ellison testified that he talked to petitioner about the mail but that she was not interested.  Mr. Ellison also testified that petitioner could have understood the mail if she had read it.  Petitioner testified that she occasionally read documents from the Hoyt organization or the IRS if Mr. Ellison left them out.  Petitioner also testified that she could have looked at the mail and Mr. Ellison's files regarding the Hoyt partnerships if she had wanted.

Mr. Ellison did not hide, or try to hide, any mail from petitioner. Furthermore, knowledge or reason to know for purposes of section 6015(f) is defined by Rev. Proc. 2000-15, 2000-1 C.B. 447, as knowledge or reason to know "of the item giving rise to a deficiency." Petitioner knew about the Hoyt partnerships.

Petitioner claims that Mr. Hoyt's deceit is relevant to the determination whether petitioner is entitled to relief under section 6015(f). Ms. Boak considered the fact that both petitioner and Mr. Ellison were deceived by Mr. Hoyt. Even if Mr. Hoyt's deceit is relevant, it does not lead to the result petitioner desires.

A purpose of section 6015 is to protect one spouse from the overreaching or dishonesty of the other. See Purcell v. Commissioner, 826 F.2d 470, 475 (6th Cir. 1987), affg. 86 T.C. 228 (1986). The understatement in tax in this case is attributable to a mistaken belief on the part of both petitioner and Mr. Ellison as to the legitimacy of the tax shelter deductions. Under these circumstances, we perceive no inequity in holding both spouses to joint and several liability. Bokum v. Commissioner, 94 T.C. 126, 146 (1990), affd. 992 F.2d 1132 (11th Cir. 1993); McCoy v. Commissioner, 57 T.C. 732, 735 (1972).

Petitioner claims that respondent disregarded petitioner's expenses and looked at adjusted gross income to determine

economic hardship.  Even if this were true, the evidence supports respondent's conclusion that petitioner will not suffer economic hardship if section 6015 relief is not granted.

First, contrary to petitioner's assertion on brief that she may have a limited number of years left to work due to her health, petitioner testified even though she had a heart attack a few years ago that as of the time of trial she was in good health.  Second, even if we included petitioner's tax liabilities for years not in issue to reach a total tax liability estimated by petitioner to be $155,000, petitioner has sufficient financial ability to pay this amount.

As of February 2003, based on the information she provided, the assets listed on the Form 433-A had a total current fair market value of approximately $260,000.[13]  Additionally, after allowing petitioner expenses of $5,564[14] listed on the Form 433-

[13]  In reaching this figure, we used the following figures: $4,398 for the checking and savings account, $166,235 for the Form 433-A investments (the actual value of the 401(k)s ($54,924.97 plus $28,880.89 plus $73,355.46), the IRA ($4,183.39), the Personal M.M.P. account ($4,890.64)), $3,554 for the cash value of the life insurance, $12,790 for the cars, $9,160 for the other vehicles, and $64,037 for the equity in their home (based on a fair market value of $187,500 (the $150,000 listed 80 percent value adjusted to 100 percent--i.e., $150,000 divided by 80 percent) minus the outstanding debt of $123,463).  This figure does not include the $15,000 of credit petitioner listed as available on the Form 433-A.

[14]  The Form 433-A states that transportation expense includes lease payments.  Petitioner and Mr. Ellison listed under "other secured debt" the lease payment for their 2002 Ford

(continued...)

A--a figure merely provided on the Form 433-A and not substantiated by any underlying evidence--petitioner had $1,134 per month (approximately $13,600 per year) available to pay towards the outstanding tax liability.

Petitioner did not present evidence that demonstrated that petitioner will be unable to pay her reasonable basic living expenses if relief is not granted. Sec. 301.6343-1(b)(4), Proced. & Admin. Regs. Accordingly, we conclude that respondent was correct, and did not abuse his discretion, in determining that petitioner would not suffer economic hardship.

Although not a specific factor listed in the revenue procedure, in considering all the facts and circumstances it is worth noting that petitioner was skeptical about the supposed tax benefits provided by the Hoyt partnerships and did not think it would work.

Petitioner also argues that respondent made blanket "pro forma" denials of Hoyt investor section 6015 claims. We disagree. Respondent's agents assigned to review petitioner's claim conducted a full, impartial, and fair evaluation of petitioner's section 6015 claim. They reached their conclusions

---

[14](...continued)
Ranger. Petitioner did not provide evidence regarding how the amount of the transportation expense on the Form 433-A was calculated. Accordingly, in determining the amount of monthly expenses, petitioner may have double counted the lease payment for the 2002 Ford Ranger.

on the basis of the facts and circumstances present in this case. See also <u>Doyel v. Commissioner</u>, T.C. Memo. 2004-35, in which we further explained the flaws in arguments on this issue.

On the basis of all the facts and circumstances, we conclude that respondent did not abuse his discretion in denying petitioner relief pursuant to section 6015(f).

In reaching our holdings, we have considered all arguments made by the parties, and, to the extent not mentioned above, we conclude they are irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.