T.C. Memo. 2007-219


UNITED STATES TAX COURT


RHONDA K. JUELL, a.k.a. RHONDA K. JUELL-PODLAK, Petitioner, AND
GLENN M. EVANS, Intervenor v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9631-06.                  Filed August 8, 2007.


    Kelly W. Hoversten, for petitioner.

    Glenn M. Evans, pro se.

    Melissa J. Hedtke, for respondent.


          MEMORANDUM FINDINGS OF FACT AND OPINION

    SWIFT, Judge:  Respondent determined deficiencies in

petitioner and intervenor's Federal income taxes for 1987 through

1994 as follows:

| Year | Deficiency |
|------|-----------|
| 1987 | $7,993 |
| 1988 | 6,710 |
| 1989 | 5,993 |
| 1990 | 7,465 |
| 1991 | 8,253 |
| 1992 | 6,787 |
| 1993 | 7,326 |
| 1994 | 2,016 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

The issue for decision is whether petitioner Rhonda Juell is entitled to relief from joint and several liability under section 6015(b), (c), or (f) with respect to the entire amount of each of the above tax deficiencies determined by respondent. Intervenor Glenn Evans (Glenn) objects to petitioner's right to any relief under section 6015.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time the petition was filed, petitioner resided in St. Cloud, Minnesota.

On October 10, 1987, Glenn and petitioner were married.

In 1988, petitioner received her teaching degree and ever since has been employed as an elementary school teacher. In 1994, the last year in issue, petitioner received a master's degree in education.

During the marriage, Glenn maintained two separate checking accounts and one separate savings account. Petitioner never had access to Glenn's separate bank accounts. Petitioner never opened and never reviewed Glenn's bank statements.

Petitioner has never received any training or instruction in business or taxes. Over the years, petitioner has simply deposited what remained, after expenses, of her approximate $18,000 yearly salary into a checking account jointly maintained by Glenn and petitioner.

During the years in issue, Glenn was a college graduate employed as a high school principal and earned approximately $42,000 annually.

During Glenn and petitioner's marriage, Glenn handled all significant financial matters, leaving some routine bills and expenses to be paid by petitioner, which petitioner paid out of the joint checking account. Glenn made all mortgage and life insurance payments and the payments relating to his separate investments out of his separate checking accounts.

In early 1990, through staff members at the school where Glenn was a principal, Glenn learned of an investment opportunity promoted by Walter J. Hoyt III that involved investing in cattle breeding partnerships (the Hoyt partnerships).[1]

---

[1]For a detailed description of the Hoyt partnerships see Bulger v. Commissioner, T.C. Memo. 2005-147.

Generally, the Hoyt partnerships enabled investors to receive partnership interests without making initial capital contributions. Investors were required to allow the Hoyt partnerships or related entities to prepare the investors' tax returns, on which returns large losses would be allocated to the partners, thereby reducing the investors' reported tax liabilities to zero. Related tax refunds investors received would be returned to the Hoyt partnerships to pay the investors' capital contributions and related fees.

Glenn traveled to Oregon to inspect a Hoyt partnership ranch. Glenn toured the ranch and met and spoke with individuals affiliated with the Hoyt partnerships. Petitioner did not accompany Glenn to the ranch.

Upon returning, Glenn explained to petitioner some aspects of the Hoyt partnerships. Petitioner told Glenn that she did not understand the investments and that she did not want to get involved in the Hoyt partnerships.

Despite petitioner's objection, Glenn invested in the Hoyt partnerships. To overcome petitioner's objection, Glenn assured petitioner that the investments were to be treated as his separate investments and his responsibility and that petitioner need not have anything to do with them.

Glenn received documents and materials relating to the Hoyt partnerships. Included in these materials were subscription

agreements relating to three series of Hoyt partnership units, powers of attorney granting Walter J. Hoyt III authority over partnership matters, and various partnership agreements. Glenn signed the documents and instructed petitioner to sign the documents. When petitioner objected, Glenn explained to petitioner that, because they were married, her signature was required in order for him to invest. Again, Glenn reassured petitioner that she need not worry and that he would take full responsibility.

Relying on Glenn's representations, and without reading them, petitioner signed the Hoyt partnership documents.

Petitioner never communicated with any Hoyt partnership representatives, never attended any partnership-related meetings, and never read any correspondence or promotional materials from the Hoyt partnerships. Petitioner placed mail relating to the Hoyt partnerships aside, unopened, for Glenn to deal with, as she considered the Hoyt partnerships his investments.

All payments and contributions to the Hoyt partnerships were made by Glenn from his separate bank accounts. Over the years, Glenn wrote more than 20 checks exceeding $55,956 to the Hoyt partnerships and related entities.

At no time did petitioner contribute any funds to the Hoyt partnerships.

Glenn collected and gathered the necessary documents to enable WJ Hoyt Sons Laguna Tax Service, a Hoyt partnership-related entity, to prepare his and petitioner's joint Federal income tax returns.

On or about July 25, 1991, on behalf of Glenn and petitioner, WJ Hoyt Sons Laguna Tax Service prepared and submitted to respondent a Form 1045, Application for Tentative Refund, for the years 1987, 1988, and 1989, on which a claimed $143,854 net operating loss relating to the Hoyt partnerships was carried back from 1990. For 1990 through 1993, the same Hoyt partnership-related tax preparer prepared Glenn and petitioner's joint Federal income tax returns.

During the years in issue, claimed Hoyt partnership-related losses dramatically reduced Glenn and petitioner's reported joint adjusted gross income (AGI), resulting in Glenn and petitioner's receiving tax refunds of Federal income taxes paid for 5 of the 8 years in issue, and significantly reducing Glenn and petitioner's reported tax liabilities for the other tax years.

The schedule below reflects, for each of the years in issue, Glenn and petitioner's reported AGI before claiming the Hoyt partnership-related items and their reported AGI after claiming the Hoyt-related items:

| Year | Glenn and Petitioner's Reported AGI Before Hoyt Partnership-Related Claimed Tax Benefits | Glenn and Petitioner's Reported AGI After Hoyt Partnership-Related Claimed Tax Benefits |
|------|------|------|
| 1987 | $51,210 | 0 |
| 1988 | 46,696 | 0 |
| 1989 | 51,435 | 0 |
| 1990 | 64,522 | ($142,216) |
| 1991 | 61,669 | 5,030 |
| 1992 | 69,530 | 29,639 |
| 1993 | 68,124 | 25,882 |
| 1994 | 86,523 | 76,368 |

When a tax refund was received, it was deposited by Glenn into one of Glenn's separate bank accounts, and Glenn would then, pursuant to his commitment under the Hoyt partnership agreement, write a check on one of his separate bank accounts to either a Hoyt partnership or a Hoyt partnership-related entity for a nearly identical amount.

Attached to the 1991, 1992, and 1993 joint Federal income tax returns were material participation statements indicating that Glenn and petitioner were co-owners of a cattle production and sales business. Attached to the 1992 return was an affidavit signed by Glenn and petitioner, stating that Glenn and petitioner were "actively engaged" in the business of cattle ranching.

Petitioner, however, was not in any way involved in the preparation of the above joint Federal income tax returns. Glenn

told petitioner, and petitioner believed, that because they were married they had to file joint tax returns. Glenn further told petitioner that, because he was involved in the Hoyt partnerships, she was required to sign the documents attached to the returns relating to the Hoyt partnerships. Relying on Glenn, petitioner signed the tax returns and attached materials, despite having not read the materials. Petitioner did not read the materials attached to the return because she felt she did not know enough to understand them.

Each year, petitioner objected to signing the tax returns reflecting the tax benefits relating to the Hoyt partnerships, and petitioner asked Glenn to get out of the Hoyt partnership investments. Petitioner reluctantly signed the tax returns and attached documents only after Glenn reassured petitioner that tax professionals had prepared them and that she was required to sign.

During the years in issue, petitioner's standard of living remained constant. There were no lavish expenditures of any kind that benefited petitioner, and petitioner did not receive any benefit from the tax refunds and the tax reductions based on the Hoyt partnerships because the tax refunds were deposited into Glenn's separate accounts and then contributed by Glenn back to the partnerships.

The credits and deductions relating to the Hoyt partnerships claimed on Glenn and petitioner's joint Federal income tax returns for the years in issue were eventually disallowed by respondent, resulting in the tax deficiencies determined by respondent as set forth above. See supra p. 2.

In or about October 1997, Glenn and petitioner were separated, and they were divorced in February of 2000.

During 2000, petitioner received her first correspondence from respondent alerting her to the above tax deficiencies that respondent had determined.

On August 13, 2001, petitioner acknowledged and entered into a closing agreement with respondent with respect to the above tax deficiencies relating to the Hoyt partnerships for 1987 through 1997.

On May 21, 2002, petitioner submitted to respondent a Form 8857, Request for Innocent Spouse Relief, under section 6015(b), (c), and (f) with respect to the entire amount of each tax deficiency for each year in issue.

On July 16, 2003, respondent issued a preliminary determination letter denying petitioner's request for innocent spouse relief.

On February 17, 2006, respondent issued a notice of determination denying petitioner's request for innocent spouse relief.

On May 22, 2006, petitioner timely filed a petition with this Court for relief from joint and several liability with regard to the entire amount of the above tax deficiencies relating to the Hoyt partnership investments in which Glenn had invested.

Shortly before trial, respondent agreed that petitioner qualified for partial relief from joint liability under section 6015(c) for each year in issue, reducing the tax deficiency for which petitioner is allegedly liable for each year by approximately two-thirds.

Since her divorce in 2000, petitioner has timely filed separate individual Federal income tax returns, and no tax deficiencies for years subsequent to 1994 have been determined by respondent against petitioner.

Petitioner has since remarried, and petitioner and her current husband earn approximately $100,000 a year, of which petitioner earns approximately $60,000.

## OPINION

Generally, taxpayers filing joint Federal income tax returns are jointly and severally liable for all taxes due. Sec. 6013(d)(3). However, relief from joint liability may be available in circumstances described in section 6015(b), (c), and (f).

Petitioner claims that she is entitled to additional relief from joint liability under section 6015(b), (c), and (f), beyond the two-thirds relief already granted by respondent.

A taxpayer spouse who meets certain qualifications may elect relief under section 6015(b).  Generally, to qualify for relief under section 6015(b)(1), the electing spouse must establish that:

      (A) A joint return was filed;

      (B) there is an understatement of tax on the return which is attributable to the erroneous items of the nonelecting spouse;

      (C) in signing the return, the electing spouse did not know, and had no reason to know, that there was such an understatement;

      (D) taking into account all the facts and circumstances, it is inequitable to hold the electing spouse liable for the deficiency in tax for the taxable year attributable to the understatement; and

      (E) a timely election has been made.

Respondent does not dispute that petitioner meets the requirements of subparagraphs (A) and (E) of section 6015(b)(1), but respondent contends that petitioner has not satisfied the requirements of subparagraphs (B), (C), and (D).

Section 6015(b)(1)(B):  Attributable to Nonelecting Spouse

When determining whether an erroneous item is attributable to a nonelecting spouse, we look not only to how ownership is

nominally held between the spouses but also to each spouse's level of participation in the activity which gave rise to the erroneous item.

Joint ownership, by itself, is not determinative of whether the erroneous item is attributable to one or both spouses.  See Rowe v. Commissioner, T.C. Memo. 2001-325; Buchine v. Commissioner, T.C. Memo. 1992-36, affd. 20 F.3d 173 (5th Cir. 1994).  A key factor is whether and to what extent the electing spouse voluntarily participated in the investment which gave rise to the erroneous item.

Generally, an electing spouse who voluntarily agrees to enter into an investment and who actively participates in it is precluded from attributing the entire investment to the nonelecting spouse.  See Abelein v. Commissioner, T.C. Memo. 2004-274; Capehart v. Commissioner, T.C. Memo. 2004-268, affd. 204 Fed. Appx. 618 (9th Cir. 2006); Bartak v. Commissioner, T.C. Memo. 2004-83, affd. 158 Fed. Appx. 43 (9th Cir. 2005); Ellison v. Commissioner, T.C. Memo. 2004-57; Doyel v. Commissioner, T.C. Memo. 2004-35.

However, if the electing spouse is not an active participant, the electing spouse may qualify for relief even though being named as a shareholder or partner.  See McKnight v. Commissioner, T.C. Memo. 2006-155 (in the context of section

6015(c) and (f)); <u>Rowe v. Commissioner</u>, <u>supra</u>; <u>Buchine v. Commissioner</u>, <u>supra</u>.

In <u>Bartak v. Commissioner</u>, <u>supra</u>, <u>Ellison v. Commissioner</u>, <u>supra</u>, and <u>Doyel v. Commissioner</u>, <u>supra</u>, the electing spouses each agreed to invest in the investments which gave rise to the erroneous items and did so jointly with their spouses by using funds from joint bank accounts.  Further, the electing spouses considered the investments to be their own, as well as their husbands', and were denied relief because the erroneous items were not entirely attributable to their husbands.

Similarly, in <u>Abelein v. Commissioner</u>, <u>supra</u>, and <u>Capehart v. Commissioner</u>, <u>supra</u>, the electing spouses not only used funds from joint accounts to invest, but also met and toured with persons associated with the business activities, contacted them on occasion, and received and read materials relating to them.

In contrast, in <u>McKnight v. Commissioner</u>, <u>supra</u>, <u>Rowe v. Commissioner</u>, <u>supra</u>, and <u>Buchine v. Commissioner</u>, <u>supra</u>, because they did not participate in the business activity, the electing spouses were granted relief despite being named as shareholders or partners.  In <u>Rowe</u> the electing spouse did not make or participate in any decision relating to the activity, did not sign any checks relating to the activity, and was not otherwise involved in the activity.  In <u>Buchine</u>, the electing spouse's name appeared as shareholder and partner, but she had no knowledge of being named on the Schedule K-1, and she only attended one promotional meeting.

In McKnight v. Commissioner, supra, erroneous items were attributed entirely to the nonelecting spouse, even though the electing spouse signed organizational documents relating to the investment and was listed as a director. We noted that the spouse signed the documents at her husband's insistence, after assurances from him that he was sole owner of the business and without awareness on her part of the legal significance.

On the facts before us, petitioner more closely resembles the spouses who were granted relief in Rowe v. Commissioner, supra, and Buchine v. Commissioner, supra. Petitioner participated in the Hoyt partnerships in name only. Petitioner repeatedly objected to Glenn's involvement in the Hoyt partnerships. Petitioner never agreed to invest in the Hoyt partnerships, and petitioner signed Hoyt documents solely because of Glenn's representations and insistence and without being aware of the legal significance thereof.

At no time did petitioner invest any of her funds in the Hoyt partnerships. Petitioner did not attend any meetings, make any contact, or read any promotional materials. Glenn made all payments to the Hoyt partnerships from his separate accounts, accounts to which petitioner had no access. Mail relating to the Hoyt partnerships was left unopened for Glenn.

Respondent argues that introductory language in the closing agreement petitioner entered into with respondent constitutes an admission by petitioner that she was a partner in and agreed to

the investment in the Hoyt partnerships.  To the contrary, that particular language simply associates the Hoyt partnerships with the tax deficiencies and does not constitute an admission as to the level of petitioner's involvement in the Hoyt partnerships. See Zaentz v. Commissioner, 90 T.C. 753, 762 (1988).

Because the understatements are attributable entirely to Glenn, petitioner satisfies section 6015(b)(1)(B).

Section 6015(b)(1)(C):  Know or Reason To Know[2]

A spouse seeking relief from joint liability under section 6015(b) must not have known or had reason to know at the time of signing a joint tax return that there was an understatement of tax on a return.  Sec. 6015(b)(1)(C).  In deduction cases, the United States Court of Appeals for the Eighth Circuit has adopted the standard set forth in Price v. Commissioner, 887 F.2d 959, 963-965 (9th Cir. 1989).  See Erdahl v. Commissioner, 930 F.2d 585, 589 (8th Cir. 1991), revg. T.C. Memo. 1990-101.[3]

Under the Price standard, the Court inquires as to whether "'a reasonably prudent taxpayer under the circumstances of the

---

[2]"The requirement in sec. 6015(b)(1)(C) * * * is virtually identical to the same requirement of former sec. 6013(e)(1)(C); therefore, cases interpreting former sec. 6013(e) remain instructive to our analysis."  Doyel v. Commissioner, T.C. Memo. 2004-35.

[3]Because an appeal in this case would lie in the U.S. Court of Appeals for the Eighth Circuit, we follow Eighth Circuit law. See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted.'" Id. at 590 (quoting Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63).

Even if a spouse is not aware of sufficient facts to give her reason to know of the substantial understatement, she nevertheless may know enough facts to put her on notice that an understatement exists. Price v. Commissioner, supra at 965. The question to ask is whether "a reasonably prudent taxpayer in her position [would] be led to question the legitimacy of the deduction." Guth v. Commissioner, 897 F.2d 441, 445 (9th Cir. 1990) (citing Price v. Commissioner, supra at 975) (emphasis removed), affg. T.C. Memo. 1987-522).

A spouse electing relief may satisfy the duty to inquire by questioning the deductions and receiving assurances as to their legitimacy. Erdahl v. Commissioner, supra at 590 n.7. These assurances may come from the electing spouse's husband. See Price v. Commissioner, supra at 966 (duty of inquiry satisfied where spouse questioned husband about large deductions who assured her that the returns were prepared by a C.P.A.); Foley v. Commissioner, T.C. Memo. 1995-16 (spouse satisfied duty of inquiry by asking husband about tax shelter deductions, hearing that she should not worry because he invested in tax shelters and

because return preparer had signed return); <u>Estate of Killian v. Commissioner</u>, T.C. Memo. 1987-365 (spouse took reasonable steps to determine the accuracy of the return by questioning husband about sham losses, who assured her that the losses were due to an investment recommended by a C.P.A. who prepared the return).

The factors established in <u>Price v. Commissioner</u>, <u>supra</u>, as to whether the electing spouse had reason to know or a duty to inquire include the spouse's level of education, the spouse's involvement in family financial affairs, the evasiveness or deceit of the culpable spouse, and any unusual or lavish expenditures inconsistent with the family's ordinary standard of living.  <u>Erdahl v. Commissioner</u>, <u>supra</u> at 591 (quoting <u>Guth v. Commissioner</u>, <u>supra</u> at 444).

On the facts before us, we find that petitioner did not know and did not have reason to know of the understatements on the tax returns when she signed them.  Petitioner satisfied her duty of inquiry by questioning her husband and receiving strong and repeated assurances from him.

All four factors discussed in <u>Price v. Commissioner</u>, <u>supra</u>, weigh in favor of granting petitioner relief.  Petitioner had no experience academically or practically regarding business, taxes, or investments and has worked as an elementary school teacher. Petitioner's involvement in the family financial affairs was limited to paying routine bills out of the joint account.  Glenn

was deceptive in that he told petitioner she had to file joint Federal income tax returns with him and that the Hoyt partnerships would be his responsibility. Finally, there occurred no unusual or lavish family expenditures that would have notified petitioner of the understatement.

Respondent contends that the size of the deductions on the tax returns was sufficient to instill in petitioner a duty to inquire. Even if such a duty arose, petitioner satisfied the duty of inquiry by confronting Glenn each year and questioning the Hoyt partnership-related items.

Because petitioner did not know or have a reason to know that the deductions were erroneous, and because she satisfied her duty of inquiry, petitioner satisfies section 6015(b)(1)(C).

Section 6015(b)(1)(D): Inequity

Whether it would be inequitable to hold a spouse liable for a tax deficiency is determined by "taking into account all the facts and circumstances." Sec. 6015(b)(1)(D).[4] The two most often cited factors to be considered are: (1) Whether there has been a significant benefit to the spouse claiming relief, and (2) whether the failure to report the correct tax liability on

---

[4]"The requirement in sec. 6015(b)(1)(D) * * * is virtually identical to the same requirement of former sec. 6013(e)(1)(D); therefore cases interpreting former sec. 6013(e) remain instructive to our analysis." Doyel v. Commissioner, T.C. Memo. 2004-35.

the joint return results from concealment, overreaching, or any other wrongdoing on the part of the other spouse. <u>Alt v. Commissioner</u>, 119 T.C. 306, 314 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004). We also consider factors utilized in determining "inequity" in the context of section 6015(f).[5] Normal support is not considered a significant benefit. <u>Estate of Krock v. Commissioner</u>, 93 T.C. 672, 678 (1989). Where the electing spouse's standard of living remains constant, significant benefit may still be found if the tax savings are "immensely beneficial". <u>Jonson v. Commissioner</u>, 118 T.C. 106, 119-120 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

Because, as stated previously, petitioner's standard of living remained constant throughout the years in issue and because the claimed tax refunds and savings were not needed or used to support petitioner but were returned to the Hoyt partnerships by Glenn, petitioner received no benefit as a result of the erroneously claimed Hoyt partnership-related tax benefits.

Respondent contends that petitioner could have received a significant benefit from the refunds even though they were reinvested and cites <u>Capehart v. Commissioner</u>, T.C. Memo. 2004-

---

[5]Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. 447, 448-449, lists nonexclusive factors to be considered in determining whether it is inequitable to hold the electing spouse liable for all or part of a deficiency under sec. 6015(f).

268 (spouse benefited from receiving refund despite reinvestment in Hoyt partnerships).

The determinative fact, however, is not that a refund was received but who benefited from it.  In particular, we have held that, where a refund was used to benefit an electing spouse in a manner beyond normal support or where an electing spouse chooses to invest a refund in business activities, a significant benefit was received.  See Abelein v. Commissioner, T.C. Memo. 2004-274 (spouse and her husband reinvested portions of refund into a business activity); Pierce v. Commissioner, T.C. Memo. 2003-188 (spouse used refund to contribute capital and lend funds to an investment); French v. Commissioner, T.C. Memo. 1996-38 (spouse used refund to jointly purchase several certificates of deposit in large denominations); Schlosser v. Commissioner, T.C. Memo. 1992-233 (spouse used refund for investments and to pay off debts), affd. without published opinion 2 F.3d 404 (11th Cir. 1993).

If, however, a tax refund is used only by a nonelecting spouse for his or her own investment, the electing spouse would not necessarily have received a significant benefit.  See Hillman v. Commissioner, T.C. Memo. 1993-151 (nonelecting spouse used refund to buy himself a Porsche automobile and a Rolex watch and to invest in a motion picture); Estate of Killian v. Commissioner, T.C. Memo. 1987-365 (nonelecting spouse used refund

to pay off his personal loans and to invest in a limited partnership).

Petitioner resembles the innocent spouses in <u>Hillman</u> and <u>Killian</u>, in that the funds were not used to benefit her in any way but were funneled into Glenn's investments in the Hoyt partnerships.

Because petitioner received little to no benefit from the erroneously claimed Hoyt partnership-related tax benefits, we find that this factor weighs heavily in favor of granting petitioner relief.

The second prominent factor--namely, concealment or wrongdoing by the nonrequesting spouse, also weighs in petitioner's favor. As stated, Glenn repeatedly told petitioner that they were required to file joint Federal income tax returns, that the Hoyt partnerships were his investments, and that he would be responsible for them. This factor, combined with other factors, demonstrates that it would be inequitable to hold petitioner liable. We note that petitioner is divorced from Glenn, that none of the erroneous deductions is attributable to her, that she did not know and had no reason to know of the substantial understatements, that she satisfied her duty of inquiry, and that she has subsequently made a good faith effort to comply with the tax laws.

The facts that weigh against granting relief, such as petitioner's lack of financial hardship, are insufficient to deny petitioner relief.  Petitioner satisfies section 6015(b)(1)(D).

## Section 6015(c) and (f)

Because petitioner qualifies under section 6015(b) for relief from joint liability with regard to 100 percent of the tax deficiencies relating to the Hoyt partnership investments, we need not address petitioner's eligibility for relief under subsections (c) and (f) of section 6015.

To reflect the foregoing,

Decision will be entered for petitioner.
