T.C. Memo. 2004-268

UNITED STATES TAX COURT

INGRID CAPEHART, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3425-03.                    Filed November 22, 2004.

<u>Terri Ann Merriam</u>, <u>Jennifer A. Gellner</u>, and <u>Wendy S. Pearson</u>, for petitioner.

<u>Robert V. Boeshaar</u> and <u>Julie L. Payne</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  This case arises from a request for relief under section 6015[1] with respect to petitioner's 1980 through 1986 taxable years.  Respondent determined that petitioner was

---

[1]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

not entitled to any relief under section 6015.  Petitioner timely filed a petition seeking review of respondent's determination. After concessions,[2] the issue for decision is whether petitioner is entitled to relief, in addition to that conceded by respondent, under section 6015(b), (c), or (f) for the taxable years 1984, 1985, and 1986.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first, second, third, and fourth stipulations of facts are incorporated herein by this reference.  Petitioner resided in Sparks, Nevada, when her petition in this case was filed.

---

[2]In the second stipulation of facts, respondent reserved an objection to the admission of Exhibit 235-P, Appeals Transmittal and Case Memo, on grounds of relevancy and hearsay.  At the end of the trial, the Court deferred ruling on Exhibit 235-P and ordered the parties to address the issue of its admissibility in their posttrial briefs.  Respondent conceded on brief that Exhibit 235-P qualified as a business record under Fed. R. Evid. 803(6) and that, therefore, his hearsay objection is "moot". Although respondent did not concede his relevancy objection, he did not pursue the objection on brief.  Consequently, we deem respondent to have abandoned his relevancy objection, and we admit Exhibit 235-P.

Respondent also conceded that petitioner is entitled to partial relief under sec. 6015(c).  Accordingly, respondent initially allocated half of the partnership items giving rise to the understatements in issue to petitioner and half to Mr. Capehart but adjusted the allocation to take into account the tax benefit to Mr. Capehart, as required by sec. 6015(d)(3)(A) and (B).  See Hopkins v. Commissioner, 121 T.C. 73, 82-87 (2003).  As a result, respondent determined that for 1980 through 1983, none of the deficiencies were allocable to petitioner and that for 1984 through 1986, $2,313.79, $3,070.05, and $3,407 of the deficiencies, respectively, were allocable to petitioner.

Background

Petitioner was born and raised in Germany.  Petitioner attended 8 years of elementary school and spent 3 years at a girls' school where she learned grammar, reading, writing, history, religion, first aid, cooking, and sewing.

Petitioner met Mr. Capehart[3] in Germany while he was serving in the U.S. Army.  In 1962 they were married, and in 1963 they moved to the United States.  Petitioner and Mr. Capehart were married for 40 years and were living together when Mr. Capehart died on January 23, 2002.

Petitioner did not speak any English when she met Mr. Capehart, but after she came to the United States, petitioner taught herself to read and write in English.  Petitioner is fluent in English.

Petitioner and Mr. Capehart moved several times within the United States, and they also lived in Germany.  Because of these moves, petitioner was required to change jobs frequently.  Petitioner worked as a bookkeeper and also did filing and typing.  Although petitioner quit working for a period of time to stay home with her children, she eventually convinced Mr. Capehart that she should go back to work.  Petitioner took a part-time job

---

[3]Mr. Capehart dropped out of high school to join the U.S. Army, but he later obtained a general equivalency diploma while serving in Germany.  Mr. Capehart never went to college and had no formal training in finance, Federal taxation, or cattle ranching.

as a sales clerk at a military store and, later, at a 7-Eleven store, even though she was aware that Mr. Capehart was opposed to the idea of her working outside of the home.  Petitioner eventually started working as a bank teller, and about 2 years later, her supervisor trained her as a new accounts clerk.  At the bank, petitioner received advanced training in selling bank services, soliciting clients' business, and handling safe deposit boxes.

Throughout their marriage, Mr. Capehart made decisions about purchasing the family's homes, automobiles, and boats. Although petitioner did not always agree with Mr. Capehart's decisions, she usually deferred to his judgment.  While petitioner often tried to please Mr. Capehart to avoid evoking his temper, Mr. Capehart never acted violently towards petitioner, even when she sought employment outside of the home in spite of his opposition to the idea.  Mr. Capehart never physically abused petitioner or threatened her.

Petitioner and Mr. Capehart maintained a joint bank account, from which petitioner was responsible for paying their bills. Because Mr. Capehart was not good at math and did not like to write checks, petitioner wrote and signed most of the checks drawn on their account, and petitioner balanced the checkbook.

Hoyt Partnership Investments

Walter J. Hoyt III (Mr. Hoyt) was the son of a prominent Shorthorn cattle breeder, who, along with other members of his family, organized, promoted, and operated more than 100 cattle-breeding partnerships (the Hoyt partnerships) from 1971 through 1998. Each partnership was organized and marketed in the same manner, and Mr. Hoyt served as the general partner of each partnership. For an overview of the Hoyt organization, see Bales v. Commissioner, T.C. Memo. 1989-568; see also River City Ranches #1, Ltd. v. Commissioner, T.C. Memo. 2003-150; Mekulsia v. Commissioner, T.C. Memo. 2003-138; Durham Farms #1 v. Commissioner, T.C. Memo. 2000-159, affd. 59 Fed. Appx. 952 (9th Cir. 2003); River City Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209, affd. 23 Fed. Appx. 744 (9th Cir. 2001).

In 1983 Mr. Capehart learned about the Hoyt partnerships from his brother-in-law. Petitioner and Mr. Capehart eventually met with Mr. Hoyt to discuss the partnerships. During their initial meeting, Mr. Hoyt explained that he had developed a special breed of cows, which sold at a very high price, and that their investment in the cattle would grow as the cows reproduced. Mr. Hoyt further explained that he would refile petitioner and Mr. Capehart's tax returns for the past 3 years and that, in doing so, they would get a refund from the Internal Revenue Service (IRS), which they could use to make their initial

investment in the partnership. Petitioner inquired whether that was legal, and Mr. Hoyt assured her that it was. Petitioner asked other questions of Mr. Hoyt during this meeting, but she felt as though many of her questions remained unanswered.

Mr. Hoyt provided petitioner and Mr. Capehart with a packet of promotional materials relating to the Hoyt partnerships. The materials included a document entitled "The 1,000 lb. Tax Shelter, A ROUND-UP OF DATA AND A QUICK COURSE IN CATTLE BREEDING TAX SHELTERS", which stated in pertinent part: (1) "SPECIFIC RISKS INVOLVED * * * A change in the tax law or an audit and disallowance by the IRS could take away all or part of the tax benefits, plus the possibility of having to pay back the tax savings, with penalties and interest"; (2) "we know we will be subject to constant audits by the IRS"; and (3) "If you don't have a tax man who knows you well enough to give you specific personal advice as to whether or not you belong in the cattle business, stay out." Mr. Capehart reviewed the documents, but petitioner chose not to.

Petitioner was skeptical about investing in the partnership, so she had one of her clients from the bank, who was an attorney, review the partnership and subscription agreement. Petitioner did not give the attorney any of the promotional materials to review. The attorney advised petitioner that the agreement

appeared to be legal, but he was unable to offer any opinion as to the legitimacy of the business itself.

On July 12, 1984, petitioner and Mr. Capehart invested in one of the Hoyt partnerships called Shorthorn Genetic Engineering 1983-2 (SGE). Petitioner did not trust Mr. Hoyt, and she tried to convince Mr. Capehart that they should not invest in SGE. Both petitioner and Mr. Capehart, however, signed the subscription agreement, which included a power of attorney and a partnership agreement, to invest in SGE. On the signed subscription agreement, under the heading "Type of Ownership", a checkmark was placed on the line indicating "Joint Tenancy". Petitioner signed the document because Mr. Capehart told her that he wanted to join SGE.

From 1984 to 1996, petitioner and Mr. Capehart continued to invest in other Hoyt partnerships.[4] Both petitioner and Mr. Capehart signed documents related to their purchase of additional partnership interests, and the Hoyt organization issued certificates in both of their names to reflect their joint ownership of partnership units.

Petitioner and Mr. Capehart invested in the Hoyt partnerships using funds from their joint bank account. Mr.

---

[4]The additional partnerships in which petitioner and Mr. Capehart invested were Hoyt & Sons Trucking Partners J.V., Timeshare Breeding Service J.V., Timeshare Breeding Service 1989-2, and Durham Genetic Engineering 1983-2 J.V.

Capehart gave petitioner all of the bills they received from the various Hoyt entities, and petitioner paid them by filling out and signing personal checks drawn on their joint account. In addition, petitioner purchased three of the six cashier's checks that she and Mr. Capehart sent to the Hoyt organization.

After investing in the partnerships, petitioner and Mr. Capehart received monthly newsletters, advertisements, and newspaper articles from the Hoyt organization that informed them of recent developments in the cattle breeding industry and events taking place within the Hoyt partnerships. Petitioner never opened any mail unless it was addressed only to her, so petitioner did not read all of the information they received from the Hoyt organization. Mr. Capehart often shared correspondence from the Hoyt organization with petitioner, but petitioner suspected that he only showed her favorable documents to prove to her that they had made a wise investment.

Petitioner and Mr. Capehart also toured several of the Hoyt ranches over a 2-day period. During the ranch tour, petitioner received a folder containing partnership information provided by the Hoyt organization. In addition, petitioner and Mr. Capehart received "Resource Allocation" forms on which they could rank certain proposed Hoyt partnership projects in the order that they believed would make the best use of their capital contributions. While petitioner did not complete her own form, she filled out

Mr. Capehart's for him, and both petitioner and Mr. Capehart signed the form.[5]

Both petitioner and Mr. Capehart contacted the Hoyt organization on several occasions to inquire about their contributions to the Hoyt partnerships, and Mr. Capehart often asked petitioner to make phone calls about specific issues relating to their investment. As they received more letters from the IRS about the partnerships, petitioner began making more phone calls to the Hoyt organization.

Tax Returns

Petitioner and Mr. Capehart filed joint Federal income tax returns for 1980 through 1986. On July 31, 1984, petitioner and Mr. Capehart filed Form 1045, Application for Tentative Refund, on which they carried back an investment credit from SGE to 1980, 1981, and 1982. As a result, petitioner and Mr. Capehart reported no income tax liability for 1980 and 1981, reported an income tax liability of only $384 for the taxable year 1982, and claimed cumulative income tax overpayments for 1980, 1981, and 1982 of $12,315.

On their Federal income tax returns for 1983 through 1986, petitioner and Mr. Capehart reported the following:

---

[5]Ultimately, petitioner forgot to submit Mr. Capehart's form to the Hoyt organization.

|  Year | Total income before Sch. E loss | Sch. E loss | IRA contribution | Investment credit |
|---|---|---|---|---|
| 1983 | $44,139 | $10,090 | $1,650 | $3,225 |
| 1984 | 48,350 | 30,270 | 1,600 | |
| 1985 | 53,611 | 34,306 | 2,400 | |
| 1986 | 54,167 | 36,324 | 2,400 | |

The Schedule E, Supplemental Income Schedule, losses were the losses attributable to SGE that were allocated to petitioner and Mr. Capehart on the Forms K-1, Partner's Share of Income, Credits, Deductions, etc., received from the Hoyt organization. The IRA contributions represented amounts allegedly contributed to IRAs established for petitioner and Mr. Capehart. The investment tax credit claimed for 1983 was allocated to petitioner and Mr. Capehart by the Hoyt organization with respect to their investment in SGE.

The Hoyt organization prepared petitioner and Mr. Capehart's 1983 through 1986 returns and the Form 1045.[6] Before signing each return, Mr. Capehart gave it to petitioner, and, together, they reviewed it for accuracy by comparing the figures reported on the return to the records they had submitted to the Hoyt organization. Neither petitioner nor Mr. Capehart understood how the Hoyt organization had arrived at some of the figures reported

_____

[6]Before petitioner and Mr. Capehart invested in the Hoyt partnerships, a certified public accountant had prepared their returns. Petitioner began to prepare their Federal income tax returns, at some point that is not indicated in the record, when she and Mr. Capehart no longer relied on the Hoyt organization to do so.

on their returns, and petitioner questioned the legitimacy of the large losses that were reported, but both petitioner and Mr. Capehart signed the returns anyway.

The Hoyt Partnership Litigation and Settlement

The Commissioner initiated audits of the Hoyt partnerships, including, but not limited to, SGE, and sent appropriate notices to the partners, including petitioner and Mr. Capehart.[7] Mr. Hoyt, the tax matters partner for the partnerships, represented the Hoyt partnerships during the audits.

As a result of the audits, the Commissioner proposed adjustments to the Hoyt partnership tax returns. The Hoyt partnerships filed petitions in this Court to contest the partnership adjustments. The partnership-level proceedings were resolved as a result of our opinions in Shorthorn Genetic Engg. 1982-2, Ltd. v. Commissioner, T.C. Memo. 1996-515, and Bales v. Commissioner, T.C. Memo. 1989-568 (involving 26 dockets filed by partners in similar Hoyt partnerships that were tried as test cases and covered taxable years before 1982), and a memorandum of understanding between the IRS and Mr. Hoyt dated May 20, 1993 (the settlement agreement), that set forth the basis for settling all Hoyt cattle partnership cases for 1980 through 1986.

---

[7]For example, on Sept. 22, 1986, the IRS sent petitioner and Mr. Capehart a letter informing them that the IRS was examining SGE with respect to its 1983 taxable year.

In <u>Bales v. Commissioner</u>, <u>supra</u>, we held, inter alia, that although the Hoyt partnerships at issue were not lacking in economic substance and would be respected for tax purposes, adjustments to the Hoyt partnerships' proportionate shares of losses generated from the acquisition, management, and sale of Hoyt cattle were required, and the recalculated losses were deductible by the limited partners to the extent of the partners' adjusted bases.

The settlement agreement, which was executed after we issued <u>Bales</u> in 1989, provided, in pertinent part, as follows:

- deductions for contributions to an Individual Retirement Arrangement -- also called an Investment Retirement Account -- are limited to cash actually paid to custodial banks on or before the due date of the return for which the deduction is to be claimed.

    *    *    *    *    *    *    *

- The total number of cattle in service and subject to depreciation by the investor partnerships in each of the following respective years is

    1980 -- 1,736
    1981 -- 2,463
    1982 -- 2,388
    1983 -- 2,932
    1984 -- 3,476
    1985 -- 4,024
    1986 -- 6,409

- For Federal income tax purposes, all the cattle are adult breeding cattle, each having an original depreciable basis of $4,000.

- The number of cattle to be depreciated during any year will be determined by the following method:

"       The depreciable cattle in the herd of each investor partnership will be adjusted by multiplying the number listed in the partnership's books and records by the ratio of the aggregate number of cattle in service in all the partnerships (as indicated immediately above) over the aggregate number of cattle listed in the partnerships' books and records and subject to depreciation.

> For example, in the year 1980, the books and records of Florin Farms # 1 indicate that the partnership claimed 149 head of cattle subject to depreciation.  The aggregate number of cattle listed in the depreciation schedules of all the investor partnerships was 4,659.  For purposes of this case, then, Florin Farms # 1 would be considered to have 56 head of cattle subject to depreciation, computed as follows:

$$149 \times \frac{1{,}736}{4{,}659} = 56$$

- Depreciation for all cattle placed in service in 1980 will be computed using the straight line method and a 5 year useful life -- without regard to the ADR system, or any other methods previously used.

- All cattle which were already in partnerships on January 1, 1980, will be considered placed in service in 1977.  Such cattle would, therefore, be eligible for depreciation for only 2 years -- 1980 and 1981.  They would then be considered fully depreciated.

- Depreciation for all cattle placed in service after 1980 will be computed using the Accelerated Cost Recovery System, considering the cattle 5-year property.

- All purchases of cattle after 1981 are in the year the partnership is formed.

- Investment tax credit will be allowed on the number of cattle in service during the first year

of the partnership's existence (as revised by the formula discussed above), times $4,000 per head. Cattle will be considered placed in service in the year the partnership is formed.

- All cattle purchased are new section 38 property.

     *     *     *     *     *     *     *

- Satisfaction of obligations for interest, principal payments and management fees by transferring calves and culled cows will constitute ordinary income to the investor partnerships.  This convention is consistent with the Tax Court's decision in <u>Bales v. Commissioner</u>, which provides that

     "    calves are not section 1231(a) property; and

     "    although culled cattle are section 1231(a) property, the gain on which may be long term capital gain (depending on the holding period), depreciation allowed must be recaptured as ordinary income under the provisions of section 1245.

          *     *     *     *     *     *     *

- For all years after 1980, Management Company is comprised of Mr. Hoyt, who is entitled to 15% of the profits; and the 24 investor partnerships in existence at December 31, 1981.

     "    The investor partnerships are each entitled to 1/24 of the remaining 85% of the profits.

     "    The investor partnerships are each entitled to 1/24 of 100% of any net losses.

- Each partner's profit and loss sharing percentage is determined annually by comparing the partner's capital account to the aggregate of the capital accounts of all partners in the partnership.  This determination is made based on the total capital owned, not the total capital originally subscribed.

- Partners in the investor partnerships are divided into two categories:

  " Partners who continue to honor their note obligations to Ranches, and who continue to participate in the Hoyt Cattle partnership. For purposes of this memorandum, will be referred to as the "active partners."

  " Partners who have walked away from their note obligations and/or who no longer participate in the partnership. For purposes of this memorandum, will be referred to as the "inactive partners."

- The determination of when and whether a partner is active or inactive and the status of the partner's ownership interest will be made using all appropriate records of Ranches, the investor partnerships and the individual partners including, but not limited to, Ranches' note records; whether or not Schedules K-1 were issued to partners; whether the partners continued to claim items from the partnership on Federal income tax returns; correspondence; and Forms 1099.

- The amount of liabilities assumed personally by the partners during the first year of the partnership will be based on original subscription agreements, and will be provided by Walter J. Hoyt III within one week after the partnership spreadsheet is submitted to him for review and/or correction.

- For Federal income tax purposes, the maximum amount of partnership debt which can be assumed by all partners in an investor partnership is determined by multiplying the number of cattle in service during the first year of the partnership's existence -- as indicated above -- by the fair market value of the cattle for Federal income tax purposes, $4,000.

  > For example, Poison Creek Ranches # 2 is considered to have put in service 118 head of cattle in 1981. The cost basis of the cattle for purposes of depreciation is $4,000 per head. Therefore, the maximum amount of the

note due to Ranches incident to depreciation, and which is includible in the partner's basis is $472,000, calculated as follows:

| | |
|---|---:|
| Cattle In Service | 118 |
| Cost Basis (per head) | $ 4,000 |
| Total Partnership Note Includible in Basis | $472,000 |

- All partners who originally assumed personal liability for a portion of the partnership debt during the first year of the partnership -- whether they are now determined to be active or inactive partners -- will be assigned a share of the lower amount of recognized partnership debt described above. Each partner's share will be the exact same percentage as his/her share of the partnership debt originally assumed.

    *    *    *    *    *    *    *

- Inactive partners are deemed to have liquidated their respective partnership interest when they abandon it, according to the following guidelines:

    " The amount realized by partners on the liquidation of their partnership interest will be the amount of the assumed liability for which they remained liable when they abandoned their interest in the partnership. This amount is the partner's share of the lower recognized partnership debt described above.

    " The deemed liquidation of partnership interest by inactive partners will occur on December 31 of the year they become inactive, as described above.

- In computing "At Risk," active partners are entitled to include their prorated share of partnership debt which was previously attributable to inactive partners for purposes of "At Risk" and basis. Active partners assume this additional debt on the date an inactive partner is deemed to have liquidated his/her partnership interest, as described in the immediately preceding paragraph.

- Profits, losses and credits -- after considering Mr. Hoyt's share -- are allocated strictly on the basis of capital account. This means that each partner's interest in the credits, profits and/or loss is calculated annually by comparing the partner's capital account to the aggregate of the capital accounts of all partners in the partnership.

  For purposes of computing a partner's capital account, all partners are entitled to include their share of partnership debt for which they assumed personal liability, until they liquidate their interest in the partnership.

- Any partner having a capital account below zero has a basis in the partnership below zero.

Pursuant to, and in accordance with, the settlement agreement and our opinion in Shorthorn Genetic Engg. 1982-2, Ltd. v. Commissioner, T.C. Memo. 1996-515, the capital account of petitioner and Mr. Capehart was recomputed, and computational adjustments were made to the distributive shares of Hoyt partnership losses claimed by petitioner and Mr. Capehart, resulting in deficiencies for each of the years at issue. The adjustments were primarily attributable to the Hoyt organization's having sold more cattle to the various Hoyt limited partnerships than it actually owned, see id., having overvalued some of the cattle sold to the Hoyt limited partnership, see Mora v. Commissioner, 117 T.C. 279, 292 (2001), and having failed to properly account for income generated by the sale of calves in calculating partnership losses, see Bales v. Commissioner, T.C. Memo. 1989-568.

Petitioner's Claim for Section 6015 Relief

On or about August 29, 2000, petitioner filed Form 8857, Request for Innocent Spouse Relief (And Separation of Liability and Equitable Relief), on which she requested relief pursuant to section 6015(b) and (f) for 1980 through 1997.[8]

On August 24, 2001, respondent sent petitioner a preliminary determination denying petitioner's request for relief under section 6015(b), (c), and (f) for 1980 through 1986.  Respondent denied relief on the basis that:  (1) Petitioner had actual knowledge or reason to know of the item giving rise to the understatement; (2) petitioner did not show that the erroneous items were attributable to her spouse; (3) petitioner did not demonstrate that it would be inequitable to hold her liable for the deficiency attributable to the understatement; and (4) petitioner did not meet the marital status requirements of section 6015(c).  On September 17, 2001, petitioner timely submitted a written appeal of respondent's determination to the IRS Appeals Division.

On December 4, 2002, respondent issued a notice of determination in which he concluded that petitioner did not qualify for relief from joint and several liability under section 6015(b), (c), or (f).  With respect to his determination under

---

[8]On Nov. 14, 2000, respondent sent petitioner a letter that indicated petitioner's request for relief with respect to the 1987 through 1997 taxable years was premature.

section 6015(b), respondent stated that "You failed to meet all the requirements of IRC section 6015(b); therefore, you do not qualify for relief under the law." With respect to his determination under section 6015(f), respondent stated that "You are not eligible for relief under the law since the majority of the factors weigh against equitable relief."

On March 3, 2003, petitioner filed a timely petition with this Court pursuant to section 6015(e) seeking review of respondent's determination with respect to petitioner's 1980 through 1986 taxable years.

OPINION

In general, taxpayers filing joint Federal income tax returns are each responsible for the accuracy of their return and are jointly and severally liable for the entire tax liability due for that year. Sec. 6013(d)(3); Butler v. Commissioner, 114 T.C. 276, 282 (2000). In certain circumstances, however, a spouse may obtain relief from joint and several liability by satisfying the requirements of section 6015.[9]

Section 6015(a)(1) provides that a spouse who has made a joint return may elect to seek relief from joint and several liability under section 6015(b) (dealing with relief from

---

[9]Sec. 6015 applies to tax liabilities arising after July 22, 1998, and to tax liabilities arising on or before July 22, 1998, that remain unpaid as of such date. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3201(g), 112 Stat. 740.

liability for an understatement of tax on a joint return). Section 6015(a)(2) provides that a spouse who is eligible to do so may elect to limit that spouse's liability for any deficiency with respect to a joint return under section 6015(c). Relief from joint and several liability under section 6015(b) or (c) is available only with respect to a deficiency for the year for which relief is sought. Sec. 6015(b)(1)(D) and (c)(1); see H. Conf. Rept. 105-599, at 252-254 (1998), 1998-3 C.B. 747, 1006-1008. If relief is not available under either section 6015(b) or (c), an individual may seek equitable relief under section 6015(f), which may be granted by the Commissioner in his discretion.

In this case, petitioner contends that she is entitled to full relief from liability under section 6015(b) or (f). Alternatively, petitioner seeks full relief under section 6015(c), contending that no part of the deficiency is allocable to her.

Our jurisdiction to review petitioner's request for relief is conferred by section 6015(e), which allows a spouse who has requested relief from joint and several liability to contest the Commissioner's denial of relief by filing a timely petition in this Court. We address petitioner's request for relief under subsections (b), (c), and (f) of section 6015 in turn.

A. <u>Section 6015(b)</u>

Section 6015(b)(1) authorizes respondent to grant relief from joint and several liability if the taxpayer satisfies each requirement of subparagraphs (A) through (E).  Section 6015(b)(1) provides:

> SEC. 6015(b). Procedures For Relief From Liability Applicable to All Joint Filers.--
>
>> (1) In general.--Under procedures prescribed by the Secretary, if--
>>
>>> (A) a joint return has been made for a taxable year;
>>>
>>> (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;
>>>
>>> (C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;
>>>
>>> (D) taking into account all of the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and
>>>
>>> (E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election,
>>
>> then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the

extent such liability is attributable to such understatement.

The requirements of section 6015(b)(1) are stated in the conjunctive.  Therefore, if the requesting spouse fails to meet any one of them, she does not qualify for relief.  Alt v. Commissioner, 119 T.C. 306, 313 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).  Except as provided by section 6015, the requesting spouse bears the burden of proving that she satisfies each requirement of section 6015(b)(1).[10]  See Rule 142(a).

Respondent does not dispute that petitioner meets the requirements in subparagraphs (A) and (E) of section 6015(b)(1) but contends that petitioner has not satisfied the requirements of subparagraphs (B), (C), and (D) of section 6015(b)(1).  Petitioner disagrees.

With respect to subparagraph (B) of section 6015(b)(1), petitioner argues that the understatement of tax is attributable entirely to Mr. Capehart because the investment in SGE was not a joint investment and that Mr. Capehart was solely responsible for investing in SGE.  Respondent argues that the understatement of tax is not solely attributable to the erroneous items of Mr. Capehart because both petitioner and Mr. Capehart owned the partnership interest in SGE, and petitioner participated in the

---

[10]Petitioner does not contend that sec. 7491 applies to this case and has not produced evidence to show she satisfied the requirements of sec. 7491(a).

joint investment.  Respondent relies on Ellison v. Commissioner, T.C. Memo. 2004-57, to support his position.

In Ellison, we held that the taxpayer failed to prove that the understatement of tax was solely attributable to the erroneous items of the nonrequesting spouse under section 6015(b)(1)(B) because the requesting spouse was a partner in the Hoyt partnership and held the partnership units in joint tenancy with her spouse.  The taxpayer in Ellison also signed partnership documents and checks payable to the Hoyt organization and used funds from a joint account she held with her spouse to invest in the partnership.

The material facts of Ellison are indistinguishable from those in the present case and support the conclusion that the erroneous items are not solely Mr. Capehart's items.  Petitioner signed the required partnership documents confirming she was a partner, and petitioner and Mr. Capehart invested in the Hoyt partnerships using funds from their joint bank account. Petitioner purchased cashier's checks and wrote and signed all of the personal checks that were payable to the various Hoyt entities for their partnership interests.  The Hoyt organization issued certificates for partnership units in both of their names and viewed petitioner and Mr. Capehart as joint investors.

Petitioner contends, however, that joint ownership of the investment is not determinative of whether the erroneous item

giving rise to the understatement is attributable to one or both spouses. Relying on Rowe v. Commissioner, T.C. Memo. 2001-325, petitioner argues that the erroneous items should be attributed to the spouse who made the decisions relating to the investment that produced the erroneous items.

In Rowe, we declined to allocate to the taxpayer any portion of the erroneous losses generated by the taxpayer's spouse's farming activities even though the taxpayer was listed as one of the proprietors on the joint tax returns. The taxpayer in Rowe did not make or participate in the making of any decisions relating to the activity, was not allowed to see the entire tax return before it was filed, was not consulted by her spouse before he engaged in the activity, did not sign any checks for expenses related to the activity, and was not otherwise involved in the farming activity.

In contrast to the facts in Rowe, the record in this case establishes that petitioner was actively involved, along with Mr. Capehart, in matters relating to their investment in SGE. Petitioner and Mr. Capehart met with Mr. Hoyt, toured the Hoyt ranches, received various promotional and informational materials from the Hoyt partnerships, became partners by signing the subscription agreement, and signed the income tax returns prepared by the Hoyt organization. In addition, petitioner arranged for an attorney to review the subscription and

partnership agreement before she and Mr. Capehart signed it, and she made phone calls to the Hoyt organization on several occasions to obtain answers to both her own and Mr. Capehart's questions about their investments. Regardless of whether Mr. Capehart played a dominant role in the decision to invest in the Hoyt partnerships or whether petitioner, at times, was simply following Mr. Capehart's orders, the fact that petitioner ultimately agreed to become a partner and participated in managing the investment is sufficient for us to find that the erroneous items giving rise to the understatements of tax are items of both petitioner and Mr. Capehart. Bartak v. Commissioner, T.C. Memo. 2004-83; Ellison v. Commissioner, supra; see also Mora v. Commissioner, 117 T.C. at 290; Doyel v. Commissioner, T.C. Memo. 2004-35.

Petitioner argues that the facts of this case are distinguishable from Bartak and Doyel because Mr. Capehart coerced petitioner into participating in the investment, controlled all aspects of the investment, and acted in a deceitful and domineering manner towards petitioner with regard to partnership matters. However, the record is lacking in credible evidence to support petitioner's allegations. Although Mr. Capehart initiated the investment in the Hoyt partnerships, he never persuaded petitioner to participate in the investment by coercing, deceiving, or threatening her. To the contrary, Mr.

Capehart included petitioner in the meeting with Mr. Hoyt, and petitioner attended the Hoyt ranch tour.  Because Mr. Capehart trusted petitioner to perform mathematical computations, he gave her all of the bills from the Hoyt organization to pay and allowed her to review all of the tax returns they filed.  In addition, Mr. Capehart showed petitioner mail they received from the partnership and often encouraged her to call the Hoyt organization to inquire about their investment.

We conclude that petitioner has failed to prove that the understatements of tax are attributable solely to erroneous items of Mr. Capehart.  Because petitioner's failure to satisfy the requirement of subparagraph (B) of section 6015(b)(1) is sufficient for us to deny any additional relief pursuant to that section, we need not decide whether petitioner satisfied the requirements of section 6015(b)(1)(C) and (D).  For the sake of completeness, however, we conclude that petitioner did not meet the requirements of section 6015(b)(1)(C) and (D) for the reasons set forth in our analysis of section 6015(f), infra.  Accordingly, we sustain respondent's determination to deny petitioner relief from joint and several liability under section 6015(b)(1).

B.    Section 6015(c)

Under section 6015(c)(3), if the requesting spouse is no longer married to,[11] or is legally separated from, the spouse with whom she filed the joint return, the requesting spouse may elect to limit her liability for the deficiency as provided for in section 6015(d).[12]  The election must be made no later than 2 years after the Secretary has begun collection activities with respect to the electing spouse.[13]  Sec. 6015(c)(3)(B).

In general, section 6015(d) provides that any item giving rise to a deficiency on a joint return shall be allocated to each spouse as though they had filed separate returns, and the requesting spouse shall be liable only for her proportionate share of the deficiency that results from such allocation.  Sec. 6015(d)(1), (3)(A).  To the extent that the item giving rise to

----

[11]A requesting spouse is no longer married if she is widowed.  Rosenthal v. Commissioner, T.C. Memo. 2004-89.

[12]A taxpayer is ineligible to elect sec. 6015(c) if the Secretary demonstrates that (1) assets were transferred between spouses filing a joint return as part of a fraudulent scheme to avoid tax or (2) the electing spouse had actual knowledge, when signing the return, of any item giving rise to a deficiency that is allocable to the other spouse.  Sec. 6015(c)(3)(A)(ii), (C). Respondent concedes that he is unable to show that either of those circumstances existed in this case.

[13]Petitioner originally did not request relief under sec. 6015(c) because she filed Form 8857, Request for Innocent Spouse Relief (And Separation of Liability and Equitable Relief), before Mr. Capehart's death.  However, respondent did not require petitioner to file another Form 8857 because respondent's determination with respect to her initial request was not final when Mr. Capehart died.

the deficiency provided a tax benefit on the joint return to the other spouse, the item shall be allocated to the other spouse in computing his or her proportionate share of the deficiency. Sec. 6015(d)(3)(B). The electing spouse bears the burden of proof with respect to establishing the portion of any deficiency that is allocable to her. Sec. 6015(c)(2).

Because respondent determined that petitioner and Mr. Capehart were joint investors in SGE, respondent attributed one-half of the partnership items giving rise to the deficiency to each of petitioner and Mr. Capehart. See sec. 6015(d)(1), (3)(A). In order for petitioner to obtain any additional relief under section 6015(c), she must prove that none of the items would have been allocated to her if she and Mr. Capehart had filed separate returns. Sec. 6015(c)(2); Mora v. Commissioner, supra at 290.

As discussed earlier in this opinion, petitioner has failed to prove that the erroneous items giving rise to the understatement of tax are items solely of Mr. Capehart. Petitioner has also failed to prove that she is entitled to a more favorable allocation than that conceded by respondent. See sec. 6015(d)(3)(B). Accordingly, we sustain respondent's determination to deny petitioner any additional relief from joint and several liability under section 6015(c).

C.  <u>Section 6015(f)</u>

We review the Commissioner's determination to deny equitable relief under section 6015(f) using an abuse of discretion standard.  <u>Butler v. Commissioner</u>, 114 T.C. at 287-292.  Under this standard of review, we defer to the Commissioner's determination unless it is arbitrary, capricious, or without sound basis in fact.  <u>Jonson v. Commissioner</u>, 118 T.C. 106, 125 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).  The question of whether the Commissioner's determination was an abuse of his discretion is a question of fact.  <u>Cheshire v. Commissioner</u>, 115 T.C. 183, 198 (2000), affd. 282 F.3d 326 (5th Cir. 2002).  A requesting spouse bears the burden of proving that the Commissioner abused his discretion in denying her relief under section 6015(f).

The parties agree that it is appropriate to consider whether petitioner qualifies for relief under section 6015(f) even though respondent has granted petitioner partial relief under section 6015(c).  See <u>Hopkins v. Commissioner</u>, 121 T.C. 73, 87 (2003).  However, the parties disagree as to whether it is inequitable to hold petitioner liable for any portion of the deficiency under section 6015(f).  Therefore, we must decide whether respondent abused his discretion in denying petitioner relief from joint and several liability under section 6015(f).  <u>Cheshire v. Commissioner</u>, <u>supra</u> at 198; <u>Butler v. Commissioner</u>, <u>supra</u> at 292.

Pursuant to section 6015(f), the Commissioner has prescribed guidelines in Rev. Proc. 2000-15, 2000-1 C.B. 447, for determining whether a requesting spouse qualifies for equitable relief under that section.[14]  In this case, although the notice of determination does not state that respondent utilized the guidelines in Rev. Proc. 2000-15, supra, to make his determination that petitioner is not entitled to relief under section 6015(f), the notice of determination refers to respondent's analysis of factors, and we assume that respondent's reference to factors in the notice of determination is to the factors enumerated in Rev. Proc. 2000-15, supra.  This Court has upheld the use of the guidelines specified in Rev. Proc. 2000-15, supra, and has analyzed the factors listed in Rev. Proc. 2000-15, supra, in reviewing the Commissioner's negative determination under section 6015(f).  See, e.g., Washington v. Commissioner, 120 T.C. 137, 147-152 (2003); Jonson v. Commissioner, supra at 125-126.  Moreover, petitioner has not objected to the use of the guidelines contained in Rev. Proc. 2000-15, supra, and she has addressed the factors in her posttrial briefs.

Rev. Proc. 2000-15, sec. 4.01, 2000-1 C.B. at 448, lists seven threshold conditions that must be satisfied before the

_____

[14]On Aug. 11, 2003, the Commissioner issued Rev. Proc. 2003-61, 2003-32 I.R.B. 296, which supersedes Rev. Proc. 2000-15, 2001-1 C.B. 447.  The new revenue procedure is effective for requests for relief filed on or after Nov. 1, 2003, and, therefore, is inapplicable here.

Commissioner will consider a request for relief under section 6015(f). Respondent concedes that petitioner satisfied the seven threshold conditions.

Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 448, provides that, in cases where the threshold conditions set forth in Rev. Proc. 2000-15, sec. 4.01 have been satisfied but the requesting spouse does not qualify for relief under Rev. Proc. 2000-15, sec. 4.02,[15] 2000-1 C.B. at 448, equitable relief may be granted under section 6015(f) if, taking into account all facts and circumstances, it is inequitable to hold the requesting spouse liable. Rev. Proc. 2000-15, sec. 4.03 (1) and (2), 2000-1 C.B. at 448-449, contains a list of positive and negative factors that the Commissioner must take into account in determining, on the facts and circumstances, whether to grant equitable relief under section 6015(f). As Rev. Proc. 2000-15, sec. 4.03 makes clear, no single factor is determinative in any particular case, all factors are to be considered and weighed appropriately, and the listing of factors is not intended to be exhaustive. See also Washington v. Commissioner, supra at 148; Jonson v. Commissioner, supra at 125.

---

[15]Rev. Proc. 2000-15, sec. 4.02, 2000-1 C.B. 447, 448, lists the circumstances under which equitable relief under sec. 6015(f) will ordinarily be granted in cases where a liability reported on a joint return is unpaid. Because this case involves deficiencies, and not unpaid liabilities reported on joint returns, Rev. Proc. 2000-15, sec. 4.02, 2000-1 C.B. at 448, does not apply. See Mellen v. Commissioner, T.C. Memo. 2002-280.

Rev. Proc. 2000-15, sec. 4.03(1) lists the following six positive factors that the Commissioner will weigh in favor of granting equitable relief:

(a) <u>Marital status</u>.  The requesting spouse is separated * * * or divorced from the nonrequesting spouse.

(b) <u>Economic hardship</u>.  The requesting spouse would suffer economic hardship (within the meaning of section 4.02(1)(c) of this revenue procedure) if relief from the liability is not granted.

(c) <u>Abuse</u>.  The requesting spouse was abused by the nonrequesting spouse, but such abuse did not amount to duress.

(d) <u>No knowledge or reason to know</u>.  In the case of a liability that was properly reported but not paid, the requesting spouse did not know and had no reason to know that the liability would not be paid.  In the case of a liability that arose from a deficiency, the requesting spouse did not know and had no reason to know of the items giving rise to the deficiency.

(e) <u>Nonrequesting spouse's legal obligation</u>.  The nonrequesting spouse has a legal obligation pursuant to a divorce decree or agreement to pay the outstanding liability.  This will not be a factor weighing in favor of relief if the requesting spouse knew or had reason to know, at the time the divorce decree or agreement was entered into, that the nonrequesting spouse would not pay the liability.

(f) <u>Attributable to nonrequesting spouse</u>.  The liability for which relief is sought is solely attributable to the nonrequesting spouse.

Rev. Proc. 2000-15, sec. 4.03(2) lists the following six negative factors that the Commissioner weighs against granting equitable relief:

(a) <u>Attributable to the requesting spouse</u>. The unpaid liability or item giving rise to the deficiency is attributable to the requesting spouse.

(b) <u>Knowledge, or reason to know</u>. A requesting spouse knew or had reason to know of the item giving rise to a deficiency or that the reported liability would be unpaid at the time the return was signed. This is an extremely strong factor weighing against relief. Nonetheless, when the factors in favor of equitable relief are unusually strong, it may be appropriate to grant relief under §6015(f) in limited situations where a requesting spouse knew or had reason to know that the liability would not be paid, and in very limited situations where the requesting spouse knew or had reason to know of an item giving rise to a deficiency.

(c) <u>Significant benefit</u>. The requesting spouse has significantly benefitted (beyond normal support) from the unpaid liability or items giving rise to the deficiency. See §1.6013-5(b).

(d) <u>Lack of economic hardship</u>. The requesting spouse will not experience economic hardship (within the meaning of section 4.02(1)(c) of this revenue procedure) if relief from the liability is not granted.

(e) <u>Noncompliance with federal income tax laws</u>. The requesting spouse has not made a good faith effort to comply with federal income tax laws in the tax years following the tax year or years to which the request for relief relates.

(f) <u>Requesting spouse's legal obligation</u>. The requesting spouse has a legal obligation pursuant to a divorce decree or agreement to pay the liability.

The knowledge or reason to know factor, the economic hardship factor, and the legal obligation factor in Rev. Proc. 2000-15, sec. 4.03(2)(b), (d), and (f), respectively, are the opposites of the knowledge or reason to know factor, the economic hardship factor, and the legal obligation factor in Rev. Proc. 2000-15,

sec. 4.03(1)(d), (b), and (e), respectively.  The attribution
factor in Rev. Proc. 2000-15, sec. 4.03(2)(a) is substantially
the opposite of the attribution factor in Rev. Proc. 2000-15,
sec. 4.03(1)(f), 2000-1 C.B. at 449.  Consequently, in our review
of the Commissioner's determination denying relief under section
6015(f), we have held that a finding with respect to the reason
to know, economic hardship, legal obligation, and attribution
factors ordinarily will weigh either in favor of or against
granting equitable relief under section 6015(f).  Ewing v.
Commissioner, 122 T.C. 32, 45 (2004).  We have also held that a
finding that a requesting spouse did not receive a significant
benefit from the item giving rise to the deficiency weighs in
favor of granting relief under section 6015(f).  Id.  Finally, we
treat evidence that the remaining positive and negative factors
are not applicable as evidence weighing neither in favor of nor
against granting equitable relief (i.e., as neutral).  Id.

In accordance with the above, we shall consider each of the
positive and negative factors enumerated in Rev. Proc. 2000-15,
sec. 4.03.  We shall also consider whether any additional facts
alleged by the parties affect the analysis of whether respondent
abused his discretion in denying petitioner equitable relief
under section 6015(f).

1.  Positive Factors

  a.  Marital Status

Although petitioner was not separated or divorced from Mr. Capehart, Mr. Capehart was deceased.  In Rosenthal v. Commissioner, T.C. Memo. 2004-89, we held that, in this context, being widowed is the same as being separated or divorced. Because petitioner is a widow, this positive factor applies and weighs in favor of granting petitioner equitable relief.

  b.  Economic Hardship

An analysis of economic hardship under Rev. Proc. 2000-15 is conducted using rules similar to those under section 301.6343-1(b)(4), Proced. & Admin. Regs., and focuses on the requesting spouse's inability to pay reasonable basic living expenses.  Rev. Proc. 2000-15, sec. 4.02(1)(c), 2000-1 C.B. at 448.  Section 301.6343-1(b)(4)(ii), Proced. & Admin. Regs., provides that the Commissioner will evaluate a requesting spouse's claim of economic hardship by considering any information offered by the requesting spouse that is relevant to the determination, including, but not limited to, the requesting spouse's income, assets and liabilities, age, ability to earn, responsibility for dependents, and the amount reasonably necessary for basic living expenses.

Petitioner did not offer any evidence of her income, expenses, assets, or liabilities other than her testimony that

she and Mr. Capehart had approximately $2,000 in the bank, drove older automobiles, and maintained an average standard of living. Petitioner's failure to offer credible evidence of her current salary, her basic living expenses, her current debts, and all of her current assets makes it impossible for us to evaluate her ability to pay the liabilities allocated to her under section 6015(c). Moreover, petitioner did not prove that requiring her to pay the reduced liabilities resulting from the allocation of liability under section 6015(c) would result in economic hardship. We conclude, therefore, that petitioner has failed to carry her burden of proving that requiring her to pay the reduced liabilities would result in an economic hardship within the meaning of section 301.6343-1(b)(4), Proced. & Admin. Regs. Because petitioner has failed to establish that she will suffer an economic hardship, we conclude that this positive factor does not apply.

c. Abuse by Nonrequesting Spouse

Petitioner alleges that she was motivated to participate in the investment because she feared Mr. Capehart. For purposes of this analysis, we shall treat petitioner's allegation as an allegation that petitioner was abused by Mr. Capehart, and we reject it. The record simply does not support a finding that Mr. Capehart persuaded petitioner to invest in the Hoyt partnerships by threatening or abusing her. Among other things, we note that

petitioner's alleged fear of Mr. Capehart did not prevent her in the past from trying to convince him that she should obtain employment outside the home, and he did not abuse her when she eventually did so. This positive factor does not apply. Ewing v. Commissioner, supra at 46; Washington v. Commissioner, 120 T.C. at 149.

        d.  No Knowledge or Reason To Know

The tax liabilities at issue in this case arose from deficiencies. Petitioner argues that she did not know or have any reason to know of the items giving rise to those deficiencies.

Although we have not specifically discussed the meaning of the phrase "item giving rise to the deficiency" in the context of section 6015(f), we have considered whether a requesting spouse had culpable knowledge for purposes of section 6015(f). See, e.g., Bartak v. Commissioner, T.C. Memo. 2004-83; Ellison v. Commissioner, T.C. Memo. 2004-57. In addition, we have specifically interpreted the phrase in deciding whether a taxpayer qualifies for relief under section 6015(c). In King v. Commissioner, 116 T.C. 198, 202-203 (2001), a case involving a deficiency resulting from erroneous deductions, we decided whether a taxpayer had "actual knowledge of the item giving rise to the deficiency" under section 6015(c)(3)(C). There, we held that section 6015(c)(3)(C), which provides an exception to a

requesting spouse's right to allocate liability under section 6015(c), requires the Commissioner to prove that the requesting spouse had actual knowledge of the factual basis for the denial of the deductions.  Id. at 204; see also Mora v. Commissioner, 117 T.C. 279 (2001) (requirement that a requesting spouse have actual knowledge of an item giving rise to the deficiency requires proof of more than a taxpayer's knowledge that an item appears on the return).

Like section 6015(c)(3)(C), Rev. Proc. 2000-15, supra, requires, for purposes of section 6015(f), that the requesting spouse's knowledge of the items giving rise to the deficiency be examined.  In order to ascertain the level of the requesting spouse's knowledge of the items giving rise to the deficiency for purposes of section 6015(f), we must examine whether the requesting spouse knew or had reason to know of the factual basis for the denial of the deductions.  See King v. Commissioner, supra at 204; Mora v. Commissioner, supra at 291-292.

In this case, respondent conceded, for purposes of section 6015(c), that he could not prove that petitioner had actual knowledge of the items giving rise to the deficiency.  With respect to section 6015(f), our review of the record convinces us that petitioner did not have actual knowledge of the items giving rise to the deficiency.  However, we still must decide whether petitioner had reason to know of the items giving rise to the

deficiency. In order to resolve the issue, we must examine whether and to what extent petitioner had reason to know of the factual basis for respondent's adjustment to the Hoyt partnership loss deductions and the IRA deductions claimed by petitioner and Mr. Capehart during the years at issue.

At the time she filed her petition, petitioner resided in Nevada. In the absence of a stipulation to the contrary, the U.S. Court of Appeals for the Ninth Circuit is presumably the proper venue for an appeal of this case. See sec. 7482(b)(2). In Price v. Commissioner, 887 F.2d 959, 963 (9th Cir. 1989), the Court of Appeals for the Ninth Circuit interpreted language contained in section 6013(e), the predecessor to section 6015(b), in order to decide whether the taxpayer requesting relief under section 6013(e) (the requesting spouse) had satisfied the requirement of section 6013(e)(1)(C) that, in signing the return, the requesting spouse did not know or have reason to know of the substantial understatement. The Court of Appeals concluded that the plain meaning of section 6013(e)(1)(C) was clear and that it required the requesting spouse "to establish that she did not know and did not have reason to know that the deduction would give rise to a substantial understatement." Id. After concluding that the requesting spouse did not have actual knowledge, the Court of Appeals examined whether the requesting spouse had reason to know of the substantial understatement. Id.

The Court of Appeals held that a requesting spouse has reason to know of the substantial understatement "if a reasonably prudent taxpayer in her position at the time she signed the return could be expected to know that the return contained the substantial understatement." Id. at 965. In evaluating how a reasonably prudent taxpayer might act, the Court of Appeals considered 4 factors: (1) The spouse's level of education; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances. After considering the factors, the Court of Appeals concluded that the requesting spouse had satisfied her burden of establishing that she did not have reason to know that the deduction in question would give rise to the substantial understatement. Nevertheless, because the Court of Appeals also concluded that the requesting spouse had knowledge of sufficient facts to put her on notice that an understatement existed, it held that the requesting spouse had a duty to inquire into the factual circumstances surrounding the deduction. Because the requesting spouse had made an appropriate inquiry, the Court of Appeals held that the requesting spouse had satisfied the

requirement of section 6013(e)(1)(C) and that she was entitled to relief under section 6013(e).

Although this case involves a different statute, we believe that the Court of Appeals would require an analysis of the "reason to know" requirement like the one it used in Price v. Commissioner, supra. Consequently, we first examine whether petitioner had reason to know of the items giving rise to the deficiency, applying the same factors used by the Court of Appeals in Price. If we conclude that petitioner did not have reason to know, we next examine whether petitioner had knowledge of sufficient facts to impose upon her a duty of inquiry. Finally, we examine whether petitioner satisfied her duty of inquiry.

In this case, petitioner, who had in Germany what appears to be the equivalent of a high school education in this country, was actively involved in the family's financial affairs. She wrote and signed most of the checks drawn on the joint checking account, and she was aware of, and sometimes participated in, decisions regarding family purchases. At trial, petitioner admitted that Mr. Capehart never concealed or deceived her about the family finances or their Hoyt partnership investments.

With respect to the Hoyt partnership investments, petitioner admitted that she had had the opportunity to review the promotional materials that she and Mr. Capehart had received

before investing in the Hoyt partnerships, but she chose not to do so.  Those promotional materials warned potential investors that the promised tax savings may be disallowed by the IRS and that potential investors should consult independent tax advisers before making an investment in the partnership.  Neither petitioner nor Mr. Capehart conducted any independent investigation, or hired a competent professional, to verify critical factual representations made by the Hoyt organization. Petitioner admitted that the large bills she and Mr. Capehart received from the Hoyt organization "didn't look right to * * * [her]" and she felt that "somehow or another * * * [they were] being taken advantage of."  Moreover, petitioner was aware of, and questioned the large losses claimed on the tax returns she reviewed and signed.  Suspecting that the partnership deductions were not legitimate, petitioner testified that, considering the income they reported, the figures reported on their tax returns from the Hoyt partnerships "scared the living daylight out of * * * [her]".  Nevertheless, petitioner still signed the tax returns claiming partnership losses and an investment tax credit from SGE and IRA contribution deductions for contributions allegedly made on behalf of her and Mr. Capehart.  On these facts, we conclude that petitioner has not shown that she had no reason to know of the items giving rise to the deficiency.

Even if we were to conclude that a reasonably prudent person in petitioner's position at the time she signed the returns for the years at issue could not have been expected to know of the items giving rise to the deficiencies in this case, we would still conclude that petitioner had failed to satisfy her duty of inquiry.  Petitioner and Mr. Capehart did not make any effort to verify the most important and most basic facts essential for the viability of the Hoyt partnership investments and their tax consequences.  For example, they conducted no investigation whatsoever of whether the Hoyt partnerships in which they were investing actually owned cattle in sufficient numbers and with sufficient value to support the projected loss deductions.  They did not ask a knowledgeable tax professional to investigate or verify that they would have sufficient basis in their Hoyt partnership investments to claim their distributive shares of partnership losses.  They allowed the promoter of the Hoyt partnerships to prepare their personal income tax returns, and they apparently never requested or obtained verification that the IRA contributions claimed on their joint returns had actually been made by the contribution deadlines.  We conclude, therefore, that this positive factor does not apply because petitioner had reason to know of the items giving rise to the deficiency and failed to satisfy her duty of inquiry with respect to those items.

e. Nonrequesting Spouse's Legal Obligation

Petitioner does not allege that Mr. Capehart had a legal obligation under a divorce decree or an agreement to pay the liabilities in question. In fact, petitioner and Mr. Capehart were married until Mr. Capehart's death. Consequently, we conclude that this positive factor does not apply.

f. Liabilities Solely Attributable to Nonrequesting Spouse

We concluded earlier in this opinion that, because petitioner and Mr. Capehart were joint investors and petitioner participated in the Hoyt partnership investments, the erroneous items giving rise to the deficiency are items of both petitioner and Mr. Capehart. We also concluded that, for purposes of section 6015(c) and (d), petitioner has failed to prove that more of the erroneous items giving rise to the deficiencies would be allocable to Mr. Capehart if they had filed separate returns for each year at issue. Because petitioner has failed to prove that the erroneous items giving rise to the deficiency are attributable solely to Mr. Capehart, we conclude that this positive factor does not apply.

2. Negative Factors

a. Attributable to the Requesting Spouse

Respondent determined that one-half of the erroneous items giving rise to the deficiencies were allocable to petitioner for purposes of section 6015(c) relief. We agree with that

determination for the reasons stated earlier in this opinion. The record adequately establishes that the Hoyt partnership investments made by petitioner and Mr. Capehart were joint investments and that petitioner actively participated in the making of those investments. This factor weighs against granting petitioner equitable relief under section 6015(f).

b. Knowledge or Reason To Know

For the reasons stated above in our analysis of the corresponding positive factor, we conclude that petitioner had reason to know of the items giving rise to the deficiencies in this case and/or failed to satisfy her duty of inquiry regarding the items. This factor weighs heavily against granting petitioner equitable relief under section 6015(f). Rev. Proc. 2000-15, sec. 4.03(2)(b). (This factor is an extremely strong factor weighing against relief.)

c. Significant Benefit

Petitioner argues that she did not significantly benefit beyond normal support from the Hoyt partnership losses and investment tax credit giving rise to the deficiencies. Respondent contends, however, that the SGE losses enabled petitioner and Mr. Capehart to increase their available cashflow for the years at issue by over $34,174 in tax savings, which they used to make their investments in several Hoyt partnerships, including SGE. In Doyle v. Commissioner, T.C. Memo. 2003-96,

affd. 94 Fed. Appx. 949 (3d Cir. 2004), we held that a requesting spouse significantly benefited from the items giving rise to the deficiency, which were tax shelter deductions, because she received significant tax refunds as a result of the items. Likewise, in this case, petitioner and Mr. Capehart received substantial income tax refunds as a result of items giving rise to the deficiencies. That petitioner and Mr. Capehart used the refunds to invest in the Hoyt partnerships does not protect petitioner from a conclusion that she and Mr. Capehart received a significant benefit in the form of increased disposable cashflow. We conclude that this factor applies and weighs against petitioner's claim for equitable relief under section 6015(f).

### d. Lack of Economic Hardship

As we noted in our discussion of the positive counterpart of this factor, petitioner did not introduce credible evidence to enable us to ascertain her current salary and other income, assets, debts, and reasonable living expenses, although she was certainly in a position to do so. A taxpayer's failure to call witnesses and produce relevant documentary evidence within her control supports an inference that such testimony and documentation would not support the taxpayer's position. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Because of the negative inference that we draw from petitioner's failure to produce

evidence of her current financial condition, we conclude that requiring petitioner to pay the liabilities allocated to her under section 6015(c) would not result in economic hardship as that term is defined under Rev. Proc. 2000-15. Consequently, this factor applies and weighs against granting petitioner equitable relief in our analysis.

### e. Noncompliance With Federal Income Tax Laws in Subsequent Years

Respondent did not determine that this factor applies and weighs against granting petitioner equitable relief. Moreover, respondent does not argue in his posttrial briefs that petitioner did not make a good faith effort to comply with her Federal income tax obligations in years subsequent to the ones at issue here. Consequently, we conclude that this factor does not apply, and we treat it as neutral in our analysis.

### f. Requesting Spouse's Legal Obligation

With respect to the positive counterpart of this factor, we concluded that petitioner and Mr. Capehart were married during all relevant times, that they were not divorced when Mr. Capehart died, and that neither petitioner nor Mr. Capehart had assumed sole responsibility to pay the liabilities at issue in this case. These conclusions also dictate our treatment of this factor. Because petitioner was not solely responsible for paying the liabilities at issue in this case, this factor does not apply, and we treat it as neutral in our analysis.

3.  Other Relevant Factors

Petitioner argues that in determining whether it is inequitable to hold petitioner liable for the deficiency, we must consider the complexity of the transactions and Mr. Hoyt's intentional deception of petitioner about the underlying circumstances that gave rise to the deficiencies.  Although we may consider other factors in addition to those set forth in Rev. Proc. 2000-15, supra, we have previously rejected taxpayers' arguments and denied section 6015(f) relief in cases where neither spouse had actual knowledge of the facts that made the Hoyt partnership losses unallowable as deductions on their joint returns.  Bartak v. Commissioner, T.C. Memo. 2004-83; Ellison v. Commissioner, T.C. Memo. 2004-57; Doyel v. Commissioner, T.C. Memo. 2004-35.  The purpose of section 6015 is to protect one spouse from the overreaching or dishonesty of the other spouse.  Bartak v. Commissioner, supra (citing Purcell v. Commissioner, 826 F.2d 470 (6th Cir. 1987), affg. 86 T.C. 228 (1986)).  Where the deficiency is attributable to the mistaken belief of both the requesting spouse and the other spouse as to the legitimacy of tax shelter deductions, we have held that it is not inequitable to hold both spouses jointly and severally liable.  Bokum v. Commissioner, 94 T.C. 126, 146 (1990), affd. 992 F.2d 1132 (11th Cir. 1993); McCoy v. Commissioner, 57 T.C. 732, 735 (1972);

Bartak v. Commissioner, supra; Ellison v. Commissioner, supra;
Doyel v. Commissioner, supra.

4. Conclusion

After examining the entire record before us, we conclude
that petitioner has failed to carry her burden of proving that
respondent abused his discretion in denying petitioner relief
from joint and several liability under section 6015(f) for each
of the years at issue.[16]

To reflect the foregoing,

An appropriate decision

will be entered.

---

[16]We have carefully considered all remaining arguments made
by the parties for results contrary to those expressed herein
and, to the extent not discussed above, find those arguments to
be irrelevant, moot, or without merit.